RICHARD G. COOPER AND JUNE A. COOPER, ET AL.,[1] PETITIONERS v. COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 5317-83, 6450-83, Filed January 13, 1987.
8352-83, 8798-83,
9677-83, 29230-83,
34818-83, 529-84,
25826-84.

*Thomas O'Grady*, for the petitioners in all dockets.

*Marvin C. Gutter* and *Richard A. Josepher*, for the petitioners in docket No. 34818-83.

*Lawrence A. Schechterman*, for the petitioner in docket No. 8352-83.

[1] Cases of the following petitioners are consolidated herewith: North American Financial Corp., docket No. 6450-83; Nationwide Power Corp. (formerly Southeast Equity Management, Inc.), docket No. 8352-83; Robert J. McAndrews, docket No. 8798-83; Michael E. Arnone and Gilda Arnone, docket No. 9677-83; William A. Duncan and Doris Duncan, docket No. 29230-83; Philip Dash and Harriet Dash, docket No. 34818-83; Bob R. Jenny and Joan M. Jenny, docket No. 529-84; and Jonah L. Brill, docket No. 25826-84.

*Bonnie L. Rosner* and *W. Robert Abramitis*, for the respondent.

JACOBS, *Judge*: Each of these consolidated cases involves the disallowance of deductions and tax credits claimed by petitioners [2] in connection with their purchases of solar water heating systems from A.T. Bliss & Co., Inc. (A.T. Bliss). Appendix A lists petitioners by name, the tax years involved, the deficiencies and additions to tax for each year, the place of residence for each individual petitioner, and the principal place of business for each corporate petitioner at the time their respective petitions were filed. Other issues unrelated to the aforementioned issue common to all petitioners are presented with respect to several petitioners; those issues and the petitioners concerned with such issues are set forth in Appendix B.

### FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulations of fact and attached exhibits are incorporated herein by this reference.

During 1979 and 1980, each petitioner entered into an agreement with A.T. Bliss for the purchase, on a leveraged basis, of solar water heating systems.[3] A.T. Bliss sold such systems to petitioners pursuant to three separate sales programs; viz, the 1979 program, the first half 1980 program, and the second half 1980 program. Each system sold under the 1979 program and the first half 1980 program consisted of: (1) A 48-inch by 120-inch solar collector panel; (2) a heavy duty liquid flow control pump; (3) temperature and flow sensors; and (4) an electronic control panel. The solar water heating equipment sold under the second half 1980 program consisted of a 48-inch by 120-inch solar collector panel, "plus all other components, as needed, such as heavy duty liquid flow control pump, temperature and flow sensors, and electronic control panel."

---

[2] For convenience, petitioners who filed joint returns as husband and wife are referred to as one petitioner.

[3] Although the systems were suitable for both commercial and residential uses, the systems involved herein were used solely in residences.

The solar water heating systems were offered for sale either as a full lot consisting of 27 systems or as a half lot consisting of 13 systems. The purchase price of a full lot was $100,000 ($3,704 per system); the purchase price of a half lot was $50,000 ($3,846 per system). A.T. Bliss had purchased the various components comprising a system from November, 1979 through 1980 at an average cost per system of between $250 and $300.

Petitioners Nationwide Power Corp. (Nationwide), which was formerly Southeast Equity Management, Inc., North American, Arnone, and Cooper each purchased systems from A.T. Bliss under the 1979 program. Pursuant to the terms of the 1979 program, each purchaser made a downpayment equal to 20 percent of the total purchase price and gave a note for the balance. The note bore interest at the rate of 6 percent per annum and was payable in equal monthly installments over 30 years. The purchasers had the option of deferring half the downpayment until April 1, 1980; interest at the rate of 12 percent accrued on the deferred portion of the downpayment.

The remaining petitioners (Brill, Dash, Jenny, Duncan, and McAndrews), as well as Arnone, purchased systems under the 1980 programs. The downpayment under the 1980 programs was $25,000 for full lot purchases and $14,000 for half lot purchases. The balance of the purchase price (evidenced by the purchaser's note) was payable over 15 years with interest at the rate of 7½ percent per annum; for the first 7 years, interest only was payable. The downpayment could be paid in installments, with the entire downpayment due by April 1, 1981; interest at the rate of 12 percent accrued on the unpaid balance of the downpayment.

The purchaser's note under both the 1979 and 1980 programs could be full recourse or nonrecourse[4] at the purchaser's option. Some recourse notes bore the notation that they were not negotiable. Petitioners Cooper, Duncan, Jenny, and Brill executed nonrecourse notes; petitioners Nationwide, McAndrews, Arnone (with respect to his 1979

---

[4]The purchaser was advised that if nonrecourse financing was chosen, due to application of the "at risk" rules, the depreciation deduction would be limited to the amount of the down payment.

purchase), and Dash executed recourse notes. No evidence was presented as to the nature of the notes of petitioners North American and Arnone (with respect to his 1980 purchase). All the notes, recourse as well as nonrecourse, were secured by the systems purchased from A.T. Bliss.

By prearrangement, the purchasers could lease their systems to Coordinated Marketing Programs, Inc. (Coordinated), a Florida corporation whose principal place of business was located in the same building as that of A.T. Bliss.[5] Edward Roy was the president and a director of Coordinated from its inception in 1977 until January 15, 1979; he was also the president and chairman of the board of directors of A.T. Bliss from November 9, 1979, until December 31, 1981.[6] Mr. Roy's successor as president of Coordinated was Victor Perella; from 1979 to 1981, Mr. Perella owned 182,500 of the 3 million outstanding shares of A.T. Bliss.[7]

Petitioners leased their systems to Coordinated and received a monthly rental of $19.25 per system.[8] The term of each lease was 7 years. At the end of the 7 year term, petitioners had the option (referred to herein as a put option) of requiring Coordinated to purchase the leased systems for $35,000 for a half lot, or $75,000 for a full lot. Thus, by exercising their put options, petitioners would receive an amount from Coordinated approximately equal to the outstanding balance on their notes to A.T. Bliss. The performance of Coordinated under the lease agreements (including its obligation to purchase the systems if petitioners exercised their put options) was unconditionally guaranteed by A.T. Bliss.

Since it was anticipated that each purchaser would lease the systems to Coordinated, and Coordinated would sublease and install the systems on the ultimate users' roofs, physical delivery of the solar water heating systems was not taken by purchasers. In this respect, petitioners' lease with Coordinated provided as follows:

---

[5]Initially, purchasers entered into leases with Coordinated. In August 1980, Nationwide succeeded Coordinated in leasing the solar water heating systems from them. To avoid confusion, we will refer to the lessee as Coordinated.

[6]At all relevant times, Edward Roy was the president and sole shareholder of petitioner North American.

[7]Mr. Perella was also president of petitioner Nationwide.

[8]Coordinated subleased the systems to homeowners.

Lessor is aware that the equipment covered by this lease will be installed in individual buildings. The Lessee agrees to hold the Lessor harmless for any claims by third parties, including liens for taxes, etc. The Lessor agrees that as long as the Lessee is not in default under the term of this lease, the Lessor shall have no right or equity in any leases made between Lessee and any third parties. The Lessor also grants to the Lessee the right to substitute equipment of equal or greater value when returning Lessor's property at the expiration of the lease, in order to avoid unnecessary installation or removal expenses.

The systems sold by A.T. Bliss to petitioners required additional parts not included in the package, such as a storage tank, miscellaneous piping, fitting, insulation, and other small devices, in order to be operational. Coordinated purchased and retained ownership of the storage tanks. The cost to obtain the additional components, as well as the cost of installation, was borne by the homeowner to whom the system was subleased.

In order to induce Coordinated to accept leases from the purchasers of solar water heating systems, A.T. Bliss paid Coordinated a promotional allowance of $200 for each system leased. On April 30, 1980, the amount of the promotional allowance was increased to $400 per system; on July 1, 1980, the allowance was further increased to $500 per system. A.T. Bliss lacked sufficient cash to make these promotional allowances; the source of funds for the allowances came from the purchasers' downpayments.

By the end of 1979, Coordinated had not subleased or installed any of the systems which it had leased from petitioners. By the end of 1980, approximately 20 percent of the systems leased by Coordinated in 1979 had been installed. The systems leased by Coordinated in 1980 were subleased sometime during 1981 or 1982.

Petitioners were responsible for the repair and maintenance of the leased systems. They therefore entered into prearranged maintenance agreements with Alternative Energy Maintenance, Inc. (Alternative), a Florida corporation, whose principal place of business was in the same building as that of A.T. Bliss and Coordinated. The president of Alternative was Victor Perella; James Sharon, who was treasurer and a director of Coordinated, was also the secretary-treasurer and a director of Alternative.

Petitioners paid Alternative an initial fee of $300 and a monthly fee of 75 cents per system (in the 1979 agreements) or $1.25 per system (in the 1980 agreements). The term of each maintenance agreement was 3 years; however, petitioners had the option of renewing the agreements for up to 4 additional years. The components of the A.T. Bliss solar water heating systems were covered by a minimum manufacturer's warranty of at least 1 year. During 1979 and 1980, there were no major maintenance difficulties with any of the solar water heating systems (as previously noted, no systems were installed until 1980). The minor maintenance services that were performed, such as the inspection of installed systems to insure that they were operational, or the lubrication of the pumps, were performed by employees of Coordinated.[9]

Finally, petitioners entered into prearranged agreements with Delta Accounting Services (Delta), pursuant to which petitioners paid Delta an initial fee of $200 and a monthly fee of $7.50. Delta agreed to collect the rent from Coordinated, pay the expenses incurred by petitioners in connection with their purchases from A.T. Bliss, and to remit the excess of rental income over expenses to petitioners.

Schedules from the 1979 offering circular, together with our introductory remarks, appear on pages 90-101.

The offering circulars contained no projections or forecasts of energy prices beyond the 7-year period, when petitioners' leases with Coordinated would expire.

Petitioners claimed deductions and tax credits with respect to their purchases in amounts roughly equivalent to those set forth in the offering circulars.

For the years 1979 through 1981, A.T. Bliss reported sales of the solar water heating equipment, for income tax purposes, on the installment basis. In its financial statements for such years, A.T. Bliss reported sales at the full sales price, less a reserve for doubtful collections equal to 60 percent of the notes receivable in 1979 and 50 percent of the notes receivable in 1980.

---

[9]At an unknown time, but probably in 1980, employees of Nationwide performed the maintenance work, and Alternative remitted to Nationwide $1 out of the $1.25-per-system monthly maintenance fee paid by petitioners to Alternative. The amount of the monthly fee retained by Alternative was paid to James Sharon. To avoid confusion, we will refer to Alternative as the corporation performing the maintenance service.

The 1979 offering circular prepared by A. T. Bliss contained a schedule which showed the anticipated cash-flow, considering tax savings, ensuing from the purchase of a full lot program as follows:

| | 1979 (1 month) | 1980 | 1981 | 1982 | 1983 | 1984 | 1985 | 1986 (11 months) | Total for 7 years |
|---|---|---|---|---|---|---|---|---|---|
| DISBURSEMENTS: | | | | | | | | | |
| Downpayment | $10,000 | $10,000 | | | | | | | $20,000 |
| Note payment | 479 | 5,756 | $5,756 | $5,756 | $5,756 | $5,756 | $5,756 | $5,277 | 40,292 |
| Repair and maintenance | 320 | 243 | 243 | 243 | 243 | 243 | 243 | 223 | 2,001 |
| Legal and accounting | 207 | 90 | 90 | 90 | 90 | 90 | 90 | 83 | 830 |
| TOTAL DISBURSEMENTS | 11,006 | 16,089 | 6,089 | 6,089 | 6,089 | 6,089 | 6,089 | 5,583 | 63,123 |
| RECEIPTS: | | | | | | | | | |
| Investment tax credit | 20,000 | | | | | | | | 20,000 |
| Lease income | 520 | 6,237 | 6,237 | 6,237 | 6,237 | 6,237 | 6,237 | 5,717 | 43,659 |
| Income tax savings (at 50% tax bracket) | 3,803 | 2,526 | 2,289 | 2,064 | 1,850 | 1,646 | 1,452 | 1,160 | 16,790 |
| NET CASH SAVINGS | 13,317 | (7,326) | 2,437 | 2,212 | 1,998 | 1,794 | 1,600 | 1,294 | 17,326 |
| 8% TAX-FREE INTEREST EARNED ON SAVINGS | - - - | 1,065 | 564 | 805 | 1,046 | 1,289 | 1,536 | 1,638 | 7,943 |
| CASH BALANCE, END OF YEAR | 13,317 | 7,056 | 10,057 | 13,074 | 16,118 | 19,201 | 22,337 | 25,269 | 25,269 |

The anticipated tax benefits available from the purchase under the 1979 program of a full lot were described in the offering circular as follows:[10]

| | 1979 (1 month) | 1980 | 1981 | 1982 | 1983 | 1984 | 1985 | 1986 (11 months) | Total for 7 years |
|---|---|---|---|---|---|---|---|---|---|
| DEPRECIATION: | | | | | | | | | |
| 30 Years DDB, $96,000 | $3,200 | $6,187 | $5,774 | $5,389 | $5,030 | $4,695 | $4,382 | $3,749 | $38,406 |
| Additional first year | 4,000 | | | | | | | | 4,000 |
| Repairs and maintenance | 320 | 243 | 243 | 243 | 243 | 243 | 243 | 223 | 2,001 |
| Interest | 400 | 4,768 | 4,708 | 4,643 | 4,574 | 4,501 | 4,425 | 3,983 | 32,002 |
| Legal and accounting | 207 | 90 | 90 | 90 | 90 | 90 | 90 | 83 | 830 |
| Investment tax credit converted to write-off $ at ratio of 2 to 1 | 40,000 | | | | | | | | 40,000 |
| TOTAL WRITE-OFF | 48,127 | 11,288 | 10,815 | 10,365 | 9,937 | 9,529 | 9,140 | 8,035 | 117,239 |
| LEASE INCOME ($19.25 per month) | 520 | 6,237 | 6,237 | 6,237 | 6,237 | 6,237 | 6,237 | 5,717 | 43,659 |
| NET WRITE-OFF | 47,607 | 5,051 | 4,578 | 4,128 | 3,700 | 3,292 | 2,903 | 2,321 | 73,580 |
| DOWNPAYMENT | 10,000 | 10,000 | | | | | | | 20,000 |
| WRITE-OFF RATIO | 4.8 to 1 | | | | | | | | 3.7 to 1 |

[10]No figures were provided to illustrate the cash-flow or tax benefits from purchasing a half lot in 1979.

The anticipated cash-flow, considering tax savings, ensuing from the purchase of a full lot under the first half 1980 program was as follows:

| | 1980 (6 months) | 1981 | 1982 | 1983 | 1984 | 1985 | 1986 | 1987 (6 months) | Total for 7 years |
|---|---|---|---|---|---|---|---|---|---|
| DISBURSEMENTS: | | | | | | | | | |
| Downpayment | $15,000 | $10,000 | | | | | | | $25,000 |
| Note payment | 2,812 | 5,625 | $5,625 | $5,625 | $5,625 | $5,625 | $5,625 | $2,813 | 39,375 |
| Repairs and maintenance | 502 | 405 | 405 | 405 | 405 | 405 | 405 | 202 | 3,134 |
| Accounting | 245 | 90 | 90 | 90 | 90 | 90 | 90 | 45 | 830 |
| TOTAL DISBURSEMENTS | 18,559 | 16,120 | 6,120 | 6,120 | 6,120 | 6,120 | 6,120 | 3,060 | 68,339 |
| RECEIPTS: | | | | | | | | | |
| Investment tax credit | 25,000 | | | | | | | | 25,000 |
| Lease income | 3,118 | 6,237 | 6,237 | 6,237 | 6,237 | 6,237 | 6,237 | 3,119 | 43,659 |
| Income tax savings (at 50% tax bracket) | 8,621 | 5,488 | 4,748 | 4,108 | 3,552 | 3,071 | 2,654 | 1,146 | 33,387 |
| Total receipts | 36,739 | 11,725 | 10,985 | 10,345 | 9,789 | 9,308 | 8,891 | 4,265 | 102,046 |
| NET CASH SAVINGS | 18,180 | (4,395) | 4,865 | 4,225 | 3,669 | 3,188 | 2,771 | 1,205 | 33,708 |
| 8% TAX-FREE INTEREST EARNED ON SAVINGS | - - - | 1,454 | 1,219 | 1,706 | 2,180 | 2,648 | 3,115 | 1,793 | 14,115 |
| CASH BALANCE, END OF YEAR | 18,180 | 15,239 | 21,323 | 27,254 | 33,103 | 38,989 | 44,825 | 47,823 | 47,823 |

The anticipated tax benefits available from the purchase of a full lot under that same program were as follows:

| | 1980 (6 month) | 1981 | 1982 | 1983 | 1984 | 1985 | 1986 | 1987 (6 months) | Total for 7 years |
|---|---|---|---|---|---|---|---|---|---|
| DEPRECIATION: | | | | | | | | | |
| 15 Years DDB, $96,000 | $12,800 | $11,093 | $9,614 | $8,332 | $7,221 | $6,259 | $5,424 | $2,350 | $63,093 |
| Additional first year | 4,000 | | | | | | | | 4,000 |
| Repairs and maintenance | 502 | 405 | 405 | 405 | 405 | 405 | 405 | 202 | 3,134 |
| Interest | 2,812 | 5,625 | 5,625 | 5,625 | 5,625 | 5,625 | 5,625 | 2,813 | 39,375 |
| Accounting | 245 | 90 | 90 | 90 | 90 | 90 | 90 | 45 | 830 |
| Investment tax credit converted to write-off $ at ratio of 2 to 1 | 50,000 | | | | | | | | 50,000 |
| TOTAL WRITE-OFF | 70,359 | 17,213 | 15,734 | 14,452 | 13,341 | 12,379 | 11,544 | 5,410 | 160,432 |
| LEASE INCOME ($19.25 per month) | 3,118 | 6,237 | 6,237 | 6,237 | 6,237 | 6,237 | 6,237 | 3,119 | 43,659 |
| NET WRITE-OFF | 67,241 | 10,976 | 9,497 | 8,215 | 7,104 | 6,142 | 5,307 | 2,291 | 116,773 |
| DOWNPAYMENT | 15,000 | 10,000 | | | | | | | 25,000 |
| WRITE-OFF RATIO | 4.5 to 1 | | | | | | | | 4.7 to 1 |

The anticipated cash-flow, considering tax savings, ensuing from the purchase of a full lot under the second half 1980 program was as follows:

| | 1980 (1 month) | 1981 | 1982 | 1983 | 1984 | 1985 | 1986 | 1987 (11 months) | Total for 7 years |
|---|---|---|---|---|---|---|---|---|---|
| DISBURSEMENTS: | | | | | | | | | |
| Downpayment | $15,000 | $10,000 | | | | | | | $25,000 |
| Note payment | 469 | 5,625 | $5,625 | $5,625 | $5,625 | $5,625 | $5,625 | $5,156 | 39,375 |
| Repair and maintenance | 334 | 405 | 405 | 405 | 405 | 405 | 405 | 371 | 3,135 |
| Accounting | 207 | 90 | 90 | 90 | 90 | 90 | 90 | 83 | 830 |
| TOTAL DISBURSEMENTS | 16,010 | 16,120 | 6,120 | 6,120 | 6,120 | 6,120 | 6,120 | 5,610 | 68,340 |
| RECEIPTS: | | | | | | | | | |
| Investment tax credit | 25,000 | | | | | | | | 25,000 |
| Lease income | 520 | 6,237 | 6,237 | 6,237 | 6,237 | 6,237 | 6,237 | 5,717 | 43,659 |
| Income tax savings (at 50% tax bracket) | 5,445 | 5,914 | 5,117 | 4,427 | 3,829 | 3,311 | 2,862 | 2,267 | 33,172 |
| Total receipts | 30,965 | 12,151 | 11,354 | 10,664 | 10,066 | 9,548 | 9,099 | 7,984 | 101,831 |
| NET CASH SAVINGS | 14,955 | (3,969) | 5,234 | 4,544 | 3,946 | 3,428 | 2,979 | 2,374 | 33,491 |
| 8% TAX-FREE INTEREST EARNED ON SAVINGS | - - - | 1,196 | 975 | 1,471 | 1,952 | 2,424 | 2,892 | 3,362 | 14,272 |
| CASH BALANCE, END OF YEAR | 14,955 | 12,182 | 18,391 | 24,406 | 30,304 | 36,156 | 42,027 | 47,763 | 47,763 |

The anticipated tax benefits available from the purchase of a full lot under that same program were as follows:

| | 1980 (1 month) | 1981 | 1982 | 1983 | 1984 | 1985 | 1986 | 1987 (11 months) | Total for 7 years |
|---|---|---|---|---|---|---|---|---|---|
| DEPRECIATION: | | | | | | | | | |
| 15 Years DDB, $96,000 | $6,400 | $11,944 | $10,352 | $8,971 | $7,776 | $6,739 | $5,841 | $4,640 | $62,663 |
| Additional first year | 4,000 | | | | | | | | 4,000 |
| Repairs and maintenance | 334 | 405 | 405 | 405 | 405 | 405 | 405 | 371 | 3,135 |
| Interest | 469 | 5,625 | 5,625 | 5,625 | 5,625 | 5,625 | 5,625 | 5,156 | 39,375 |
| Accounting | 207 | 90 | 90 | 90 | 90 | 90 | 90 | 83 | 830 |
| Investment tax credit converted to write-off $ at ratio of 2 to 1 | 50,000 | | | | | | | | 50,000 |
| TOTAL WRITE-OFF $ | 61,410 | 18,064 | 16,472 | 15,091 | 13,896 | 12,859 | 11,961 | 10,250 | 160,003 |
| LEASE INCOME ($19.25 per month) | 520 | 6,237 | 6,237 | 6,237 | 6,237 | 6,237 | 6,237 | 5,717 | 43,659 |
| NET WRITE-OFF | 60,890 | 11,827 | 10,235 | 8,854 | 7,659 | 6,622 | 5,724 | 4,533 | 116,344 |
| DOWNPAYMENT | 15,000 | 10,000 | | | | | | | 25,000 |
| WRITE-OFF RATIO | 4.1 to 1 | | | | | | | | 4.7 to 1 |

The anticipated cash-flow, considering tax savings, ensuing from the purchase of a half lot under the second half 1980 program was as follows:

| | 1980 (1 month) | 1981 | 1982 | 1983 | 1984 | 1985 | 1986 | 1987 (11 months) | Total for 7 years |
|---|---|---|---|---|---|---|---|---|---|
| **DISBURSEMENTS:** | | | | | | | | | |
| Downpayment | $8,000 | $6,000 | | | | | | | $14,000 |
| Note payment | 225 | 2,700 | $2,700 | $2,700 | $2,700 | $2,700 | $2,700 | $2,475 | 18,900 |
| Repair and maintenance | 316 | 195 | 195 | 195 | 195 | 195 | 195 | 179 | 1,665 |
| Accounting | 207 | 90 | 90 | 90 | 90 | 90 | 90 | 83 | 830 |
| TOTAL DISBURSEMENTS | 8,748 | 8,985 | 2,985 | 2,985 | 2,985 | 2,985 | 2,985 | 2,737 | 35,395 |
| **RECEIPTS:** | | | | | | | | | |
| Investment tax credit | 12,500 | | | | | | | | 12,500 |
| Lease income | 250 | 3,003 | 3,003 | 3,003 | 3,003 | 3,003 | 3,003 | 2,753 | 21,021 |
| Income tax savings at 50% tax bracket) | 3,782 | 2,852 | 2,471 | 2,141 | 1,854 | 1,606 | 1,390 | 1,014 | 17,200 |
| Total receipts | 16,532 | 5,855 | 5,474 | 5,144 | 4,857 | 4,609 | 4,393 | 3,857 | 50,721 |
| NET CASH SAVINGS | 7,784 | (3,130) | 2,489 | 2,159 | 1,872 | 1,624 | 1,408 | 1,120 | 15,326 |
| 8% TAX-FREE INTEREST EARNED ON SAVINGS | - - - | 623 | 422 | 655 | 880 | 1,100 | 1,318 | 1,536 | 6,534 |
| CASH BALANCE, END OF YEAR | 7,784 | 5,277 | 8,188 | 11,002 | 13,754 | 16,478 | 19,204 | 21,860 | 21,860 |

The anticipated tax benefits available from the purchase of a half lot under that same program were:

| | 1980 (1 month) | 1981 | 1982 | 1983 | 1984 | 1985 | 1986 | 1987 (11 months) | Total for 7 years |
|---|---|---|---|---|---|---|---|---|---|
| DEPRECIATION: | | | | | | | | | |
| 15 Years DDB, $46,000 | $3,066 | $5,723 | $4,960 | $4,300 | $3,726 | $3,229 | $2,799 | $2,224 | $30,027 |
| Additional first year | 4,000 | | | | | | | | 4,000 |
| Repairs and maintenance | 316 | 195 | 195 | 195 | 195 | 195 | 195 | 179 | 1,665 |
| Interest | 225 | 2,700 | 2,700 | 2,700 | 2,700 | 2,700 | 2,700 | 2,475 | 18,900 |
| Accounting | 207 | 90 | 90 | 90 | 90 | 90 | 90 | 83 | 830 |
| Investment tax credit converted to write-off $ at ratio of 2 to 1 | 25,000 | | | | | | | | 25,000 |
| TOTAL WRITE-OFF | 32,814 | 8,708 | 7,945 | 7,285 | 6,711 | 6,214 | 5,784 | 4,961 | 80,422 |
| LEASE INCOME ($19.25 per month) | 250 | 3,003 | 3,003 | 3,003 | 3,003 | 3,003 | 3,003 | 2,753 | 21,021 |
| NET WRITE-OFF | 32,564 | 5,705 | 4,942 | 4,282 | 3,708 | 3,211 | 2,781 | 2,208 | 59,401 |
| DOWNPAYMENT | 8,000 | 6,000 | | | | | | | 14,000 |
| WRITE-OFF RATIO | 4.1 to 1 | | | | | | | | 4.2 to 1 |

The anticipated cash-flow under the 1979 and 1980 (first and second half) programs, without taking tax benefits into account, was as follows:

*1979 Program—full lot*

| | 1979 (1 month) | 1980 | 1981 | 1982 | 1983 | 1984 | 1985 | 1986 (11 months) | Total for 7 years |
|---|---|---|---|---|---|---|---|---|---|
| RECEIPTS: | | | | | | | | | |
| Lease income | $520 | $6,237 | $6,237 | $6,237 | $6,237 | $6,237 | $6,237 | $5,717 | $43,659 |
| DISBURSEMENTS: | | | | | | | | | |
| Downpayment | 10,000 | 10,000 | | | | | | | 20,000 |
| Note payment | 479 | 5,756 | 5,756 | 5,756 | 5,756 | 5,756 | 5,756 | 5,277 | 40,292 |
| Repair and maintenance | 320 | 243 | 243 | 243 | 243 | 243 | 243 | 223 | 2,001 |
| Legal and accounting | 207 | 90 | 90 | 90 | 90 | 90 | 90 | 83 | 830 |
| TOTAL DISBURSEMENTS | 11,006 | 16,089 | 6,089 | 6,089 | 6,089 | 6,089 | 6,089 | 5,583 | 63,123 |
| CASH OUT OF POCKET BEFORE TAX ATTRIBUTES | (10,486) | (9,852) | 148 | 148 | 148 | 148 | 148 | 134 | (19,464) |

## 1980 (first half) Program—full lot

| | 1980 (6 months) | 1981 | 1982 | 1983 | 1984 | 1985 | 1986 | 1987 (6 months) | Total for 7 years |
|---|---|---|---|---|---|---|---|---|---|
| **RECEIPTS:** | | | | | | | | | |
| Lease income | $3,118 | $6,237 | $6,237 | $6,237 | $6,237 | $6,237 | $6,237 | $3,119 | $43,659 |
| **DISBURSEMENTS:** | | | | | | | | | |
| Downpayment | 15,000 | 10,000 | | | | | | | 25,000 |
| Note payment | 2,812 | 5,625 | 5,625 | 5,625 | 5,625 | 5,625 | 5,625 | 2,813 | 39,375 |
| Repair and maintenance | 502 | 405 | 405 | 405 | 405 | 405 | 405 | 202 | 3,134 |
| Accounting | 245 | 90 | 90 | 90 | 90 | 90 | 90 | 45 | 830 |
| TOTAL DISBURSEMENTS | 18,559 | 16,120 | 6,120 | 6,120 | 6,120 | 6,120 | 6,120 | 3,060 | 68,339 |
| CASH OUT OF POCKET BEFORE TAX ATTRIBUTES | (15,441) | (9,883) | 117 | 117 | 117 | 117 | 117 | 59 | (24,680) |

## 1980 (second half) Program—full lot

| | 1980 (1 month) | 1981 | 1982 | 1983 | 1984 | 1985 | 1986 | 1987 (11 months) | Total for 7 years |
|---|---|---|---|---|---|---|---|---|---|
| **RECEIPTS:** | | | | | | | | | |
| Lease income | $520 | $6,237 | $6,237 | $6,237 | $6,237 | $6,237 | $6,237 | $5,717 | $43,659 |
| **DISBURSEMENTS:** | | | | | | | | | |
| Downpayment | 15,000 | 10,000 | | | | | | | 25,000 |
| Note payment | 469 | 5,625 | 5,625 | 5,625 | 5,625 | 5,625 | 5,625 | 5,625 | 39,375 |
| Repairs and maintenance | 334 | 405 | 405 | 405 | 405 | 405 | 405 | 371 | 3,135 |
| Legal and accounting | 207 | 90 | 90 | 90 | 90 | 90 | 90 | 83 | 830 |
| TOTAL DISBURSEMENTS | 16,010 | 16,120 | 6,120 | 6,120 | 6,120 | 6,120 | 6,120 | 6,079 | 68,340 |
| CASH OUT OF POCKET BEFORE TAX ATTRIBUTES | (15,490) | (9,883) | 117 | 117 | 117 | 117 | 117 | (362) | (24,681) |

*1980 (second half) Program—half lot*

| | 1980 (1 month) | 1981 | 1982 | 1983 | 1984 | 1985 | 1986 | 1987 (11 months) | Total for 7 years |
|---|---|---|---|---|---|---|---|---|---|
| RECEIPTS: | | | | | | | | | |
| Lease income | $520 | $6,237 | $6,237 | $6,237 | $6,237 | $6,237 | $6,237 | $5,717 | $43,659 |
| DISBURSEMENTS: | | | | | | | | | |
| Downpayment | 15,000 | 10,000 | | | | | | | 25,000 |
| Note payment | 469 | 5,625 | 5,625 | 5,625 | 5,625 | 5,625 | 5,625 | 5,625 | 39,375 |
| Repairs and maintenance | 334 | 405 | 405 | 405 | 405 | 405 | 405 | 371 | 3,135 |
| Accounting | 207 | 90 | 90 | 90 | 90 | 90 | 90 | 83 | 830 |
| TOTAL DISBURSEMENTS | 16,010 | 16,120 | 6,120 | 6,120 | 6,120 | 6,120 | 6,120 | 6,079 | 68,340 |
| CASH OUT OF POCKET BEFORE TAX ATTRIBUTES | (15,490) | (9,883) | 117 | 117 | 117 | 117 | 117 | (362) | (24,681) |

In 1984, the Securities and Exchange Commission (the SEC) filed a complaint against A.T. Bliss and its auditors for filing materially false and misleading financial statements. Without admitting or denying the allegations in the complaint, the defendants consented to the entry of a final judgment, pursuant to which they were enjoined from further violations of sections 5(a), 5(c), and 17(a) of the Securities Act of 1933 and from violations of section 13(a) of the Securities Exchange Act of 1934, and rules 13a-1 and 13a-13 thereunder. In addition, A.T. Bliss agreed to retain new auditors to reaudit and restate its 1979, 1980, and 1981 sales in its financial statements using the cost recovery method.

Among the allegations made by the SEC was that A.T. Bliss had violated the anti-fraud provisions of the Securities Act of 1933 by failing to disclose to purchasers in 1979 through 1981 that the solar panels sold in prior years had not yet been installed. The complaint also alleged that A.T. Bliss failed to disclose to purchasers that due to Coordinated's poor installation record, there was a lack of any material cash-flow from homeowners to Coordinated.

Respondent disallowed the deductions and credits claimed by petitioners in connection with the purchase of their systems, asserting numerous alternative positions. First, according to respondent, petitioners' transactions with A.T. Bliss were a series of shams which should be disregarded for tax purposes. Even if the transactions were not completely illusory, alleges respondent, the burdens and benefits of ownership of the systems never passed to petitioners, and they acquired merely an option to purchase the systems after 7 years. During that time, claims respondent, petitioners participated in a financing arrangement with Coordinated which was thinly disguised as a sale-leaseback transaction. Even if petitioners acquired an ownership interest in the systems, asserts respondent, their claimed deductions are not allowable because they did not engage in their transactions in order to make a profit. Furthermore, respondent maintains that petitioners' notes to A.T. Bliss did not represent bona fide indebtedness; therefore, respondent claims, the notes should not be taken into account in determining petitioners' bases for the solar water heating

systems. In any event, contends respondent, petitioners did not meet the statutory requirements for entitlement to the claimed investment tax and business energy credits.

Respondent also seeks (1) imposition of an increased rate of interest pursuant to section 6621(d)[11] with respect to all petitioners, and (2) additions to tax with respect to North American for its alleged fraudulent underpayments.

## OPINION

It is well settled that taxpayers are free to structure their transactions so as to decrease or eliminate their taxes by any means which the law permits. *Gregory v. Helvering*, 293 U.S. 465 (1935); *Gordon v. Commissioner*, 85 T.C. 309 (1985). However, the desired tax benefits will not be allowed if the transaction is illusory. Thus, where taxpayers resort to "the expedient of drawing up papers to characterize transactions contrary to objective economic realities and which have no economic significance beyond expected tax benefits," we have denied the claimed tax benefits on the basis that the transactions were shams. *Falsetti v. Commissioner*, 85 T.C. 332 (1985); *Brown v. Commissioner*, 85 T.C. 968 (1985).

In arguing that the multiple transactions involved herein were a series of shams, respondent first contends that in reality petitioners entered into a sale-leaseback transaction with A.T. Bliss (i.e., a two-party transaction). In order for us to accept respondent's characterization of the transaction as a two-party sale-leaseback, we would have to disregard the existence of Coordinated as a separate corporate entity. This we shall not do. See *Moline Properties, Inc. v. Commissioner*, 319 U.S. 436 (1943).

Petitioners purchased the equipment from one party (A.T. Bliss) and leased it to another (Coordinated). Coordinated had an identity separate from A.T. Bliss. It held the systems out for sublease to homeowners, arranged for installation of the systems on homes, and otherwise engaged in business activities separate and apart from those

[11]Unless otherwise noted, all section references are to sections of the Internal Revenue Code of 1954 in effect for the years in question. All Rule references are to the Tax Court Rules of Practice and Procedure.

of A.T. Bliss. Thus, we find that the transactions involved herein were genuine multiple party transactions.[12]

We now turn to whether a bona fide sale of equipment from A.T. Bliss to petitioners occurred. To determine whether there was an actual sale of solar heating equipment from A.T. Bliss to petitioners, we must ascertain, from all the attendant facts and circumstances, the intent of the parties. *Haggard v. Commissioner*, 24 T.C. 1124 (1955), affd. per curiam 241 F.2d 288 (9th Cir. 1956). In *Grodt & McKay Realty, Inc. v. Commissioner*, 77 T.C. 1221 (1981), we considered the following factors in determining whether a bona fide sale occurred:

(1) whether legal title passed;

(2) how the parties treated the transaction;

(3) whether an equity in the property was acquired;

(4) whether the contract created a present obligation on the seller to execute and deliver a deed as well as a present obligation on the purchaser to make payments;

(5) whether the right of possession was vested in the purchaser;

(6) which party paid the property taxes;

(7) which party bore the risk of loss or damage to the property; and

(8) which party received the profits from the operation and sale of the property.

Pivotal to such a determination is whether the burdens and benefits of ownership passed to the putative purchaser.

In *Grodt & McKay Realty v. Commissioner, supra*, the taxpayers entered into a transaction in which they purported to purchase cattle. The seller, although obligated to register the cattle in the taxpayers' names, retained title in its own name; it also retained possession and control of the cattle. *Falsetti v. Commissioner*, 85 T.C. 332 (1985), involved a purported sale of an apartment complex, although legal title to the property never passed to the "purchaser" and the parties treated the transaction in a manner inconsistent with the notion that a sale occurred. In both

---

[12]We also believe that the transactions between petitioners and Alternative (with respect to providing repairs and maintenance to the systems) and Delta (with respect to providing accounting services) were genuine. 13 See also Simonson, "Determining Tax Ownership of Leased Property," 38 Tax Law. 1 (1984).

cases, we held that the purported sales were not bona fide, and we refused to recognize them for tax purposes.

Here, we find that there were bona fide sales of equipment from A.T. Bliss to each petitioner. Legal title of the solar water heating equipment passed from A.T. Bliss to petitioners. All of the profits produced from the rental of the systems were received (at least constructively) by petitioners, and they bore the burden of maintaining the system. A.T. Bliss neither used the equipment nor retained physical possession of it. The parties treated the transaction as a sale, and we believe that such in reality occurred. At the end of the lease with Coordinated, petitioners were free to use or dispose of the equipment as they wished. Nothing in the record suggests that petitioners' transactions with A.T. Bliss and Coordinated were other than at arm's length.

As will be discussed in detail *infra*, petitioners purchased a package of which the equipment was but a part; thus only a part of the amount paid by petitioners to A.T. Bliss was for the equipment. However, the fact that the entire amount of petitioners' payments was designated to be for the equipment does not invalidate the transaction as a sale.

Notwithstanding our finding that the sale to North American (as well as the sales to the other petitioners) was bona fide, we find that the sale to North American did not occur prior to the end of its 1979 fiscal year. A.T. Bliss did not purchase the solar collector panels until after North American's 1979 fiscal year had ended; accordingly, North American could not have acquired its systems from A.T. Bliss during its 1979 fiscal year. Thus, North American is not entitled to its claimed deductions and tax credits in its 1979 fiscal year; because this finding is dispositive of the issues pertaining to North American's transaction with A.T. Bliss, our use of "petitioners" hereinafter will not include North American.

Respondent next contends that petitioners so divested themselves of the incidents of ownership in the systems through their leases with Coordinated, that in reality the systems were owned by Coordinated. Petitioners contend otherwise, i.e., the contracts with Coordinated created a valid lessor-lessee relationship. Our determination as to whether the leases should be recharacterized as sales

requires an inquiry into all of the facts and circumstances involved herein. *Frank Lyon Co. v. United States*, 435 U.S. 561 (1978). Some of the considerations relevant to this inquiry are: whether the lessor expected to own an asset with a meaningful residual value at the expiration of the lease term (*Rice's Toyota World, Inc. v. Commissioner*, 81 T.C. 184 (1983), affd. in part 752 F.2d 89 (4th Cir. 1985); *Hilton v. Commissioner*, 74 T.C. 305 (1980), affd. per curiam 671 F.2d 316 (9th Cir. 1982), cert. denied 459 U.S. 907 (1982)); whether the lessor had an equity interest in the leased property (*Estate of Franklin v. Commissioner*, 64 T.C. 752 (1975), affd. 544 F.2d 1045 (9th Cir. 1976); *Narver v. Commissioner*, 75 T.C. 53 (1980), affd. 670 F.2d 855 (9th Cir. 1982)); and whether the lessor retained any risk of economic loss with respect to the property or any potential for economic gain. *Northwest Acceptance Corp. v. Commissioner*, 58 T.C. 836 (1972), affd. per curiam 500 F.2d 1222 (9th Cir. 1974); *Lockhart Leasing Co. v. Commissioner*, 54 T.C. 301 (1970), affd. sub nom. *Lockhart Leasing Co. v. United States*, 446 F.2d 269 (10th Cir. 1971).[13]

We have also recognized that some considerations have minimal significance. These include the existence of tax benefits accruing to the lessor, the absence of significant positive net cash-flow during the lease term, rental payments geared to the cost of interest and mortgage amortization, and the existence of nonrecourse financing. *Estate of Thomas v. Commissioner*, 84 T.C. 412 (1985).

The fact that a lease is part of a package put together by an orchestrator is not fatal to a finding that a lease existed, provided petitioners acquired substantial nontax interests. *Hilton v. Commissioner*, 74 T.C. 305 (1980), affd. per curiam 671 F.2d 316 (9th Cir. 1982), cert. denied 459 U.S. 907 (1982). After a careful review of the entire record, we find that a valid lessor-lessee relationship existed between petitioners and Coordinated.

The documents associated with the leases did not confer upon Coordinated any right greater than that of a lessee. Petitioners could, upon the expiration of their leases with Coordinated, lease their equipment directly to homeowners

---

[13] See also Simonson, "Determining Tax Ownership of Leased Property," 38 Tax Law. 1 (1984).

or use it in any way they desired. At the inception of the transaction, petitioners expected the price of energy to escalate, and they anticipated receiving rentals which would increase in proportion to the increase in energy costs. We believe that at all relevant times, they intended to retain the right to exploit the equipment by buying it on a leveraged basis at 1979 or 1980 prices and to later receive increased rentals reflecting escalating energy prices.

We have considered petitioners' put options pursuant to which Coordinated could be compelled to purchase the equipment at the end of the lease term. Such an option is not fatal to a finding that a lease existed, even in cases where the lessee has a concurrent option to purchase the property. *Northwest Acceptance Corp. v. Commissioner*, 58 T.C. 836 (1972), affd. per curiam 500 F.2d 1222 (9th Cir. 1974); *Lockhart Leasing Co. v. Commissioner*, 54 T.C. 301 (1970), affd. sub nom. *Lockhart Leasing Co. v. United States*, 446 F.2d 269 (10th Cir. 1971). Here, we view the put option as an additional benefit given to petitioners, not the relinquishment by them of the burdens and benefits of ownership. It was not a foregone conclusion, as respondent suggests, that petitioners would exercise their put options. While the put option affects the availability of petitioners' deductions under the at-risk rules of section 465, discussed *infra*, it does not affect the validity of the lease agreements.

We have also considered Coordinated's right to substitute, at the end of the lease term, other equipment of equal or greater value for petitioners' equipment. Arguably, such a right could deprive petitioners of the opportunity to benefit from any appreciation of the solar heating equipment, as was the situation in *Sun Oil Co. v. Commissioner*, 562 F.2d 258 (3d Cir. 1977), cert. denied 436 U.S. 944 (1978), revg. a Memorandum Opinion of this Court.

The situation involved herein differs from *Sun Oil* in several respects. Coordinated, the lessee, was not the ultimate user of the property. The degree of control which Coordinated could exercise over the leased property was considerably less than that retained by the lessee in *Sun Oil*. The value of any equipment substituted by Coordinated had to equal or exceed the fair market value of petitioners' equipment, in contrast to the *Sun Oil* lease, in which the

value of any substituted equipment was a function of the seller-lessee's cost basis in the leased property. Unlike the lessor in *Sun Oil*, petitioners (rather than Coordinated) benefited from any appreciation in the value of the equipment. Further, petitioners' rights to lease the systems directly to homeowners upon the expiration of their leases with Coordinated could not be defeated by Coordinated's right of substitution. Thus, we believe the provision giving Coordinated the right of substitution serves a valid commercial purpose consistent with petitioners' ownership of the equipment.

Respondent next contends that even if the transactions involved herein had economic substance, petitioners did not enter into the transactions with a bona fide intent to make a profit, and therefore were not engaged in any trade or business for which deductible expenses could be claimed.

The law is well settled that to constitute the carrying on of a trade or business, the activity must be engaged in with an "actual and honest objective of making a profit." *Dreicer v. Commissioner*, 78 T.C. 642 (1982), affd. without opinion 702 F.2d 1205 (D.C. Cir. 1983); *Capek v. Commissioner*, 86 T.C. 14 (1986); *Fuchs v. Commissioner*, 83 T.C. 79 (1984); *Dean v. Commissioner*, 83 T.C. 56 (1984). A profit objective is also necessary in order to deduct expenses under section 212(l) or (2). *Lemmen v. Commissioner*, 77 T.C. 1326 (1981); *Jasionowski v. Commissioner*, 66 T.C. 312 (1976).

Although a reasonable expectation of profit is not required, the activity must "be entered into, in good faith, with the dominant hope and intent of realizing a profit, i.e., taxable income, therefrom." *Hirsch v. Commissioner*, 315 F.2d 731, 736 (9th Cir. 1963), affg. a Memorandum Opinion of this Court; *Brannen v. Commissioner*, 78 T.C. 471 (1982), affd. 722 F.2d 695 (11th Cir. 1984). Thus, "profit" in this context means economic profit, independent of tax savings. *Beck v. Commissioner*, 85 T.C. 557 (1985); *Herrick v. Commissioner*, 85 T.C. 237 (1985); *Surloff v. Commissioner*, 81 T.C. 210 (1983).

The issue of whether the requisite profit objective exists is one of fact to be resolved on the basis of all the evidence in the case. *Sutton v. Commissioner*, 84 T.C. 210 (1985); *Brannen v. Commissioner*, 78 T.C. at 506; *Dunn v. Commis-*

*sioner*, 70 T.C. 715 (1978), affd. 615 F.2d 578 (2d Cir. 1980). In making this determination, more weight must be given to the objective facts than to the taxpayer's mere after-the-fact statements of intent. *Thomas v. Commissioner*, 84 T.C. 1244 (1985), affd. 792 F.2d 1256 (4th Cir. 1986); *Engdahl v. Commissioner*, 72 T.C. 659 (1979). Petitioners bear the burden of proving that they possessed the required profit objective. Rule 142(a); *Welch v. Helvering*, 290 U.S. 111 (1933).

Section 1.183-2(b), Income Tax Regs., enumerates the following nonexclusive list of factors to be considered in determining whether an activity is engaged in for profit: (1) The manner in which the taxpayer carries on the activity; (2) the expertise of the taxpayer or his advisors; (3) the time and effort expended by the taxpayer in carrying on the activity; (4) the expectation that assets used in the activity may appreciate in value; (5) the success of the taxpayer in carrying on other similar or dissimilar activities; (6) the taxpayer's history of income or losses with respect to the activity; (7) the amount of occasional profits, if any, which are earned; (8) the financial status of the taxpayer; and (9) any elements indicating personal pleasure or recreation. No one factor is conclusive; the importance of each factor must be evaluated in the context of the particular case. *Dunn v. Commissioner*, 70 T.C. at 720.

After considering the foregoing factors, we believe that petitioners entered into their leasing activities with a bona fide objective to make a profit. Petitioners carried on their leasing activities in a businesslike manner, as evidenced by the various agreements with Coordinated, Alternative, and Delta. While petitioners had no expertise in this area, and devoted little time to their leasing activities, they immediately arranged for others having expertise to perform the necessary services. Once the equipment was leased to Coordinated, nothing further remained for petitioners to undertake, at least for the ensuing 7 years. For the first 7 years, petitioners were guaranteed a rental income in excess of expenses. We find credible petitioners' assertions that they believed energy prices would increase to the point that when their leases with Coordinated expired, they would be able to exploit such higher energy prices and lease their

solar water heating equipment for a substantially greater rental.

As projected in the offering circulars, petitioners realized a small but steady profit in every year, except during the first 13 or 18 months. Coordinated's efforts to install the systems on homes were vigorous, and ultimately successful. Thus, the biggest impediment to petitioners' obtaining a profit—locating a homeowner for the equipment—was removed by the time petitioners' leases with Coordinated expired. We also find logical petitioners' belief that once the systems were installed, they would remain on the roofs of the homeowners indefinitely.

As previously stated, petitioners received more than solar water heating equipment—they received a package which consisted of equipment, the attendant tax benefits of acquiring such equipment, contract rights, and a potential stream of income. Thus, only a part of the purchase price was fairly allocable to the equipment; after carefully considering the entire record, we believe that the amount fairly allocable to the equipment should be $1,000 per system, which we believe is its fair market value.[14]

Although petitioners may have overreached in allocating the entire purchase price to the equipment in an attempt to maximize their tax benefits, such overreaching does not preclude a finding that petitioners had bona fide profit objectives independent of tax considerations. The transactions herein do not involve inflated purchase prices attributable to contingent nonrecourse notes, as was the situation in several cases wherein we found that no profit objective existed. Nor are we confronted with a situation in which a taxpayer has available to him appraisals or income projections for the equipment's entire useful life which reveal a

---

[14]In determining the fair market value of the equipment to be $1,000 per system, we had considered the testimony of both respondent's expert, Stanley Kolodkin, and petitioners' expert, Robert Hartleb. We have also considered the quantity of systems purchased (i.e., 27 systems for full lot investors and 13 systems for half lot investors).

Mr. Kolodkin stated in his written report that the list price for the equipment was between $789.90 and $811.20 per system. He testified that the "trade price for all the hardware was about $1,000 (per system)." Mr. Hartleb testified that if truckloads of systems were purchased, they could be purchased for approximately $789; he did not testify as to the fair market value of the equipment based on the quantity of systems purchased by petitioners. We have adopted Mr. Kolodkin's value of $1,000 per system.

The record is silent as to whether any part of the purchase price should be allocated to a deductible expense or to an asset (other than the equipment) for which a deduction for depreciation or amortization would be allowable. Nor did petitioners raise this issue.

large disparity between expected pre-tax profits and tax benefits. See, e.g., *Estate of Baron v. Commissioner*, 83 T.C. 542 (1984), affd. 798 F.2d 65 (2d Cir. 1986). We therefore disagree with respondent's characterization of these transactions as "abusive tax shelters that masqueraded as bona fide transactions."

Respondent next asserts that the notes executed by petitioners in exchange for the solar water heating equipment were not valid indebtedness and therefore could not give rise to valid interest deductions. We disagree.

We agree with respondent that the amount of the notes exceeds the fair market value of the equipment, which we have found to be $1,000 per system. However, such a determination does not mean that petitioners overpaid A.T. Bliss for what they received or that the notes were not bona fide. Rather, petitioners purchased a package consisting of equipment, valuable contract rights, and a potential stream of income from A.T. Bliss for between $3,704 to $3,846 per system—we believe that this package was worth all that petitioners paid for it.

We also observe that the notes did not require that payment be made only out of the rental income. In this sense, the notes were not contingent. We believe the parties intended the notes to be what they purported— bona fide debt. Hence, we hold that the notes were bona fide and the interest payments thereunder are deductible.

Notwithstanding our finding that the notes are bona fide, the entire amount of the notes cannot be used in calculating depreciation, the investment tax credit, or the energy tax credit for the equipment. The starting point in calculating the amount of depreciation and the tax credits with respect to the equipment is petitioners' bases in the equipment. Basis for purchased equipment is the amount paid for the equipment, not what is paid for something else (in this case, contract rights). *Waddell v. Commissioner*, 86 T.C. 848 (1986); *Lemmen v. Commissioner*, 77 T.C. 1326 (1981). We have already determined that the fair market value of the solar heating equipment is $1,000 for each system, and petitioners' bases (for purposes of depreciation and the tax credits) are limited to that amount.

The next issue is whether the at-risk rules of section 465 limit petitioners' allowable deductions. Generally, in a leasing activity, noncorporate taxpayers are at risk to the extent of their cash investments in the activity, together with amounts borrowed with respect to such activities if they are personally liable for repayment of those liabilities.[15] Nonrecourse notes do not constitute amounts at risk; therefore, petitioners Cooper, Duncan, Jenny, and Brill, who executed nonrecourse notes, were at risk only to the extent of their cash investments.[16]

Arnone did not present his promissory note for his 1980 purchase; we assume that it was nonrecourse. *Wichita Terminal Elevator Co. v. Commissioner*, 6 T.C. 1158 (1946), affd. 162 F.2d 513 (10th Cir. 1947).[17] Thus, he was at risk only to the extent of his cash investment for his 1980 purchase.

With respect to those petitioners who executed recourse notes (McAndrews, Arnone, for his 1979 purchase, and Dash), respondent contends that section 465(b)(4) applies, because petitioners were protected against loss through a "guarantee, stop loss agreement or other similar arrangement," in the form of put options. We agree with respondent. These petitioners, through their put options, were protected from economic loss from the inception of their transactions. The put options guaranteed petitioners that at the end of 7 years they could sell the systems to Coordinated for an amount equal to the outstanding balance on their notes to A.T. Bliss. The $75,000 notes of petitioners Dash and McAndrews required no principal payments for the first 7 years; thus, considering that they could receive $75,000 from Coordinated if the systems were put to

---

[15]Respondent argues on brief that the at-risk rules apply to 'Nationwide under sec. 465(a)(1)(C). As this theory constitutes new matter, respondent had the burden of proof (Rule 142(a)), which he has not carried.

[16]Respondent argues that the deferred portions of petitioners' downpayments to A.T. Bliss were not amounts at risk because, claims respondent, A.T. Bliss had an interest (other than as a creditor) in petitioners' leasing activities. See sec. 465(b)(3). Curiously, respondent did not advance such an argument with respect to the petitioners' long-term notes to A.T. Bliss. In order for us to accept respondent's argument, we would have to find that A.T. Bliss had either a capital interest or an interest in the net profits of petitioners' leasing activities. See sec. 1.465-8(b), Proposed Income Tax Regs., 44 Fed. Reg. 32235 (June 5, 1979). The record does not support such a finding.

[17]Petitioners Brill and Arnone made cash investments in excess of the fair market value of the systems they purchased in 1980. Their deductions are, as previously discussed, limited by their bases in the equipment, which was only $13,000 for Brill and $6,500 for Arnone.

Coordinated (and Coordinated's performance was guaranteed by A.T. Bliss), these petitioners were fully protected against economic risk. Therefore, their obligations under the notes may not be added to their amounts at risk. However, petitioner Arnone, with respect to his investment in the 1979 program, was required to make principal payments on his $40,000 long-term note during the first 7 years; he in fact made the required payments during the years in issue. The amount he could receive if the systems were put to Coordinated was $35,000. Thus, in addition to his own downpayment, he was at risk to the extent of $5,000, the principal payments he was required to make.[18]

Petitioners believed that the systems were placed in service in the year they were sold and simultaneously leased to Coordinated. They therefore claimed depreciation, investment tax credit, and energy tax credit with respect to their systems in the years of purchase.[19] The systems were in fact installed in homes subsequent to the year of purchase. Respondent disallowed the depreciation deductions and tax credits, asserting that the systems were not placed in service in the respective years for which petitioners claimed tax benefits. Petitioners, citing sections 1.167(a)-11(e)(1) and 1.46-3(d)(1)(ii), Income Tax Regs., claim that the systems were in actual use as of the date their leases with Coordinated commenced, because the systems were at that time "placed in a condition or state of readiness and availability for a specifically assigned function."

Alternatively, petitioners rely on *Clemente, Inc. v. Commissioner*, T.C. Memo. 1985-367, for the proposition that the systems were placed in service on the date of purchase because each system, "while not in actual use during the year in issue, was nevertheless devoted to the business of the taxpayer and ready for use should the occasion arise."

In *Waddell v. Commissioner*, 86 T.C. 848 (1986), we held that taxpayers who executed distribution agreements simultaneously with purchase agreements for medical equipment were entitled to depreciation and investment tax credits in the year the equipment was purchased. We decided therein

---

[18]As previously discussed, Arnone's deductions with respect to his 1979 purchase are already limited by his basis in the equipment, which was $13,000 (13 units × $1,000 per unit).

[19]Petitioners Arnone, Duncan, and Dash carried the claimed credits to other taxable years.

that property which is held for leasing to others in a profit-motivated leasing venture is placed in service when it is first held out for lease.

Petitioners herein executed their lease agreements with Coordinated simultaneously with their purchase agreements with A.T. Bliss; at that time, the systems were available for use in petitioners' profit-motivated leasing venture. We hold, therefore, that petitioners' systems were placed in service as of the date of purchase.

Respondent next argues that the individual petitioners are not entitled to the investment tax credit for the solar water heating equipment because they failed to meet the 15-percent test set forth in section 46(e)(3).[20] Petitioners assert that the noncorporate lessor rules of section 46(e)(3) do not affect the business energy credit.

The basis for petitioners' contention is that section 46(e)(3) applies to leased "property" which is not the same as "energy property." Petitioners point out that section 46(a)(2), which describes the amount of credit available for section 38 property, uses the term "energy property." From this usage, petitioners conclude that Congress was aware that "property" and "energy property" are not the same and that by making section 46(e)(3) applicable only to "property," Congress did not intend to include "energy property" within its ambit. We disagree.

In our opinion, section 46(e)(3) is applicable to all equipment subject to a lease, whether or not the equipment is energy property. Section 46(e)(3) was added by section 108(a) of the Revenue Act of 1971, Pub. L. 92-178, 85 Stat. 507, 1972-1 C.B. 449, and was effective with respect to leases entered into after September 22, 1971. Section 46(a)(2) was enacted in 1978.[21] Prior to enactment of section 46(a)(2), the term "energy property," for tax purposes, did not exist. It is hardly surprising, then, that section 46(e)(3) makes no reference to "energy property." We decline to infer that Congress, when it enacted the energy tax credit

---

[20]Sec. 46(e)(3) provides that a noncorporate lessor who did not manufacture or produce the leased property may claim the section 38 tax credit with respect to such property only if (a) the term of the lease (taking into account options to renew) is less than 50 percent of the useful life of the property and (b) the lessor, in the first 12 months after the property is transferred to the lessee, incurs expenses with respect to such property which are deductible under sec. 162 and which exceed 15 percent of the rental income produced by the property.

[21]Energy Tax Act of 1978, Pub. L. 95-618, 92 Stat. 3194, 1978-3 C.B. (Vol. 2) 20.

provisions of section 46(a)(2), intended to simultaneously exempt energy property from the requirements of section 46(e)(3). Our conclusion is supported by the fact that Congress, in the Technical Corrections Act of 1979, Pub. L. 96-222, 94 Stat. 209, 1980-1 C.B. 507, amended section 46(e)(3) to exempt qualified rehabilitated buildings from its provisions. Had Congress intended to exempt energy property from the provisions of section 46(e)(3), it likewise could have specifically so provided.

Petitioners, in order to qualify under section 46(e)(3) for either the investment tax credit or the business energy credit, therefore must show that the amount of their leasing expenses exceeded 15 percent of the amount of their rental receipts for the first 12 months after the property was transferred to Coordinated.[22] Once they have met the objective criteria of section 46(e)(3), petitioners need not demonstrate that they were engaged in the trade or business of leasing or that the leases in question were part of a trade or business. *Miller v. Commissioner*, 85 T.C. 1064 (1985). Even if there were a separate trade or business test in section 46(e)(3), we would find for petitioners.

We reject respondent's contention that the expenses incurred by petitioners were not ordinary and necessary. On the contrary, we think that the maintenance and accounting expenses were of the type that are normally incurred in connection with leasing activities. Furthermore, we do not think petitioners' maintenance and accounting expenses were capital expenditures within the meaning of section 263. We see no impediment, then, to the deductibility of petitioners' maintenance and accounting expenditures under section 162[23] to the extent they were paid.

Delta, who rendered accounting services to the petitioners, in effect, acted as a clearing house for the flow of the funds. Each petitioner authorized Delta to receive rental income from Coordinated, to disburse therefrom the maintenance fee due Alternative and to retain its accounting fee.

---

[22]Respondent does not dispute that the term of each lease was less than 50 percent of the useful life of the property. Respondent also does not dispute that the property was sec. 38 property, as defined in sec. 48(a).

[23]For purposes of the 15 percent test of sec. 46(e)(3), non-section 162 expenses such as interest, taxes, and depreciation are not taken into account. Installation expenses are also not taken into account because even if they constituted noncapital expenditures, they were not borne by petitioners, but by the homeowners.

Petitioners received a quarterly check for the difference. Thus, it is apparent that the maintenance and accounting fees were paid. The amount of the maintenance and accounting fees exceeded 15 percent of the rental income for the first 12 months after the equipment was leased to Coordinated. Thus, each of the individual petitioners is entitled to the investment tax credit. Petitioner Nationwide is also entitled to the investment tax credit, as the requirements of section 46(e)(3) do not apply to it.

The availability of the business energy credit is also disputed by respondent on the ground that the equipment purchased by petitioners does not constitute energy property. Section 48(l)(2) defines energy property as solar or wind energy property (in addition to other types of property, none of which is present here). Solar or wind energy property, according to section 48(l)(4), means any equipment which uses solar or wind energy to generate electricity, to heat or cool (or provide hot water for use in) a structure, or to provide solar process heat. As we found, the solar water heating equipment did not constitute a working solar water heating system; various additional parts, such as a storage tank and installation components, were necessary. We reject respondent's argument, however, that the lack of a completely functional system precludes a finding that the equipment was energy property.

Relevant regulations were promulgated on January 19, 1981, but were made retroactive effective October 1, 1978. Those regulations provide that the term "solar energy property" includes equipment and materials *and parts solely related to the functioning of such equipment* that use solar energy directly to generate electricity, heat or cool a building, or provide hot water for use within a building. Sec. 1.48-9(d)(1), Income Tax Regs. Equipment specifically mentioned in the regulations includes collectors, storage tanks, rockbeds, thermostats, and heat exchangers; none of these items alone, or in combination with each other, would constitute a completely functional solar heating system. Clearly, under the regulations, petitioners' equipment would qualify as "energy property"; respondent's position that petitioners' property did not so qualify is inconsistent with his own regulation. Further, we think that the statutory

definition of a solar water property is sufficiently broad to include the component parts of a solar water heating system, and is not limited to a completely functional system as a whole. Therefore, we hold that the petitioners are entitled to the business energy credit.

Respondent has requested that we impose an increased rate of interest pursuant to section 6621(d) on all petitioners. Section 6621(d) provides that interest which accrues after December 31, 1984, on a substantial underpayment attributable to a tax-motivated transaction shall be 120 percent of the otherwise applicable rate. Section 6621(d) applies only if a tax-motivated transaction results in an underpayment in excess of $1,000. Sec. 6621(d)(2). A "tax-motivated transaction" includes, among other things, any valuation overstatement, as defined in section 6659(c). Section 6659(c) defines a valuation overstatement as a claim on a return that the value of any property is 150 percent or more of the amount determined to be the correct value. Each petitioner claimed on his (or its) return a value for the equipment which exceeded 150 percent of the amount we have determined to be its correct value, and each petitioner's underpayment attributable thereto exceeded $1,000, except for Arnone with respect to years 1976 and 1977. Thus, each petitioner's underpayment was attributable to a tax motivated transaction (except for Arnone with respect to years 1976 and 1977), and the increased rate of interest pursuant to section 6621(d) applies.[24]

Respondent, in his notice of deficiency for North American, determined that an addition to tax pursuant to section 6653(b) should be imposed. Section 6653(b) provides that if any part of any underpayment is due to fraud, 50 percent of the underpayment shall be added to the tax. The burden of proving that section 6653(b) applies is on respondent. Rule 142(b). Respondent's basis for contending that section 6653(b) should apply to North American is that North American, through Edward Roy, knew that A.T. Bliss did

[24]The underpayments of petitioners North American, Arnone, and McAndrews were also attributable to transactions other than their investments with A.T. Bliss. Respondent does not argue that sec. 6621(d) applies to the portions of the underpayments caused by such other transactions. Accordingly, the increased rate of interest pursuant to sec. 6621(d) applies only to that portion of those petitioners' underpayment which is attributable to their transactions with A.T. Bliss.

not yet own any solar heating equipment as of September 25, 1979, the date A.T. Bliss purported to sell such equipment to North American, nor as of September 30, 1979, North American's fiscal yearend.

Fraud, as used in section 6653(b), means actual intentional wrongdoing. *McGee v. Commissioner*, 61 T.C. 249, 256 (1973), affd. 519 F.2d 1121 (5th Cir. 1975). The intent required is a voluntary, intentional violation of a known legal duty; in this case, to evade a tax believed to be owing. *Stoltzfus v. United States*, 398 F.2d 1002 (3d Cir. 1968), cert. denied 393 U.S. 1020 (1969); *Estate of Temple v. Commissioner*, 67 T.C. 143 (1976). Where direct evidence of fraudulent intent is not available, its existence may be determined from the conduct of the taxpayer and the surrounding circumstances. *Stone v. Commissioner*, 56 T.C. 213 (1971). The Supreme Court has stated that an "affirmative willful attempt may be inferred from * * * any conduct, the likely effect of which would be to mislead or conceal." *Spies v. United States*, 317 U.S. 492, 499 (1943).

The record shows that A.T. Bliss contracted, at the earliest, in November of 1979 for the purchase of the necessary components comprising the systems sold to petitioners. As of September 30, 1979, A.T. Bliss did not own any such components and could not have sold them to North American before North American's 1979 fiscal yearend. We believe that Edward Roy, the president and sole shareholder of North American and the president and chairman of the board of A.T. Bliss, was aware of that fact. We also believe that Edward Roy was aware that North American was not entitled to claim tax benefits with respect to property not yet in existence, nor to carry back any "unused" portion of such tax benefits to the corporation's 1978 taxable year. Based on the entire record, we find that North American, through Edward Roy, intended to evade income taxes when it claimed tax benefits in connection with its solar heating equipment. Therefore, we sustain respondent's position that the addition to tax pursuant to section 6653(b) should be imposed on petitioner North American.

In addition to determining deficiencies arising from transactions with A.T. Bliss, respondent raised other issues as

set forth in Appendix B with respect to North American, Arnone, and McAndrews. The focus of this case was petitioners' transactions with A.T. Bliss; no evidence was adduced by either side with respect to these other issues. Petitioners North American, Arnone, and McAndrews had the burden of proving that respondent erred in his determinations with respect to these other issues. *Welch v. Helvering*, 290 U.S. 111 (1933); Rule 142(a). In the absence of any evidence or argument, we have no choice but to uphold respondent's determinations with respect to the other issues involving North American, Arnone, and McAndrews.

To reflect the foregoing,

*Decisions will be entered under Rule 155.*

APPENDIX A

| Petitioner | Docket No. | Tax years | Deficiency | Addition to tax[1] | Residence when petition filed |
|---|---|---|---|---|---|
| Richard G. and June A. Cooper | 5317-83 | 1979 | $8,236.00 | | North Palm Beach, Florida |
| | | 1980 | 6,582.00 | | |
| North American Financial Corp. | 6450-83 | 9/30/78 | 5,926.87 | $2,963.44 | Pompano Beach, Florida |
| | | 9/30/79 | 57,172.00 | 28,586.00 | Pompano Beach, Florida |
| Nationwide Power Corp. (formerly Southeast Equity Mgmt., Inc.) | 8352-83 | 1979 | 10,721.00 | | Pompano Beach, Florida |
| Robert J. McAndrews | 8798-83 | 1980 | 31,425.00 | | Grand Rapids, Michigan |
| Michael E. and Gilda Arnone | 9677-83 | 1976 | 782.00 | 39.00 | Plantation, Florida |
| | | 1977 | 137.00 | 7.00 | |
| | | 1979 | 7,570.00 | 379.00 | |
| | | 1980 | 9,337.00 | 467.00 | |
| William A. and Doris Duncan | 29230-83 | 1977 | 7,139.00 | | Plantation, Florida |
| | | 1978 | 7,729.00 | | |
| | | 1979 | 2,660.00 | | |
| | | 1980 | 9,084.00 | | |
| | | 1981 | 12,687.00 | | |
| Philip and Harriet Dash | 34818-83 | 1978 | 8,328.00 | | Miami, Florida |
| | | 1979 | 11,692.00 | | |
| | | 1980 | 21,522.00 | | |
| Bob R. and Joan M. Jenny | 529-84 | 1980 | 33,550.00 | | Pompano Beach, Florida |
| | | 1981 | 4,314.00 | | |
| Jonah L. Brill | 25826-84 | 1980 | 4,931.66 | | Brooklyn, N.Y., New York |

[1]Sec. 6653(b) for petitioner North American Financial Corp. and sec. 6653(a) for petitioners Michael E. and Gilda Arnone.

## APPENDIX B

Re: North American Financial Corporation (North American)

(1) Whether respondent properly disallowed certain deductions for expenses claimed by North American for its fiscal years ended September 30, 1978 and 1979, as follows:

| Type of expense | Amount disallowed | Fiscal year for which expenses claimed |
|---|---|---|
| Sales | $7,693.50 | FYE 9/30/78 |
| | 21,946.19 | 9/30/79 |
| Legal and professional | 7,500.00 | FYE 9/30/78 |
| | 5,000.00 | 9/30/79 |
| Research and development | 15,100.00 | FYE 9/30/79 |
| Moving | 5,000.00 | FYE 9/30/79 |

(2) Whether North American sustained a loss in the amount of $29,755.18 from the disposition of a Treasury Bill in its fiscal year ended September 30, 1979;

(3) Whether North American failed to report taxable income in the amount of $3,000 for its fiscal year ended September 30, 1979.

Re: Michael E. & Gilda Arnone (Arnone)

(1) Whether Arnone could carry forward to 1979 and 1980 a claimed loss in 1975 of an investment in the stock of Gold Coin Restaurant Corporation.

(2) Whether Arnone is entitled to a deduction for rental expenses in 1980 in the amount of $2,326;

(3) Whether Arnone failed to report income from wages in the amount of $1,697 in 1980.

(4) Whether Arnone is subject to additions to tax pursuant to section 6653(a) for 1976, 1977, 1979, and 1980.

Re: Robert J. McAndrews

Whether petitioner McAndrews is entitled to a deduction in 1980 for tax advisory fees in the amount of $3,000.