ALAN J. LEVY and MARSHA O. LEVY, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Levy v. Commissioner
Docket Nos. 18780-84, 32881-85, 14079-86
United States Tax Court
T.C. Memo 1991-646; 1991 Tax Ct. Memo LEXIS 695; 62 T.C.M. (CCH) 1636; T.C.M. (RIA) 91646; December 26, 1991
*695 Decisions will be entered under Rule 155. Mervin M. Wilf, for the petitioners. Alan E. Cobb, for the respondent. SWIFT, Judge. SWIFT
Respondent determined deficiencies in petitioners' Federal income taxes and additions to tax as follows: Additions to Tax, Secs. [1]
Year
Deficiency
6651(a)(1)
6661
1980
$ 20,432
$ 501
$ --
1981
28,194
--
--
1982
21,012
--
2,101
Petitioners claim losses, deductions, and investment tax credits relating to an investment in a real estate limited partnership by the name of Cooper River Office Building Associates (CROBA). The remaining issues for decision are: (1) Whether the purchase of two office buildings by CROBA was a sham transaction lacking in economic substance; (2) whether ownership of the buildings was transferred to CROBA and, *696 if so, whether the transfer occurred in 1980 or in 1981; (3) whether depreciation with respect to the buildings can be claimed for 1980 using the half-year convention; (4) the deductibility of amounts designated as rental payments relating to the land on which the buildings were located, as loan commitment fees, and as salary payments to the general partner of CROBA; and (5) whether petitioners are liable for the additions to tax. FINDINGS OF FACT Some of the facts have been stipulated and are so found. Petitioners resided in Plantation, Florida, at the time they filed their petitions in these consolidated cases. All references to "petitioner" are to Alan J. Levy. Between 1966 and 1968, Cooper River Development Co., Inc. (Cooper River Development Co.), constructed two commercial office buildings on 4.25 acres of land it owned in Camden County, New Jersey. On February 7, 1977, the Cooper River Development Co. filed a petition under chapter XI of the Bankruptcy Act. The two office buildings referred to above were among the assets of the debtor estate. In August of 1978, William L. Rogers (Rogers), president of Cooper River Development Co., met with representatives of the Jackson-Cross *697 Co., Inc. (Jackson-Cross), a large real estate firm with offices in Wilmington, Delaware, Washington, D.C., and Philadelphia, Pennsylvania, to discuss the possible sale of the two buildings as part of the bankruptcy proceeding. On the advice of Jackson-Cross, efforts to sell the buildings were postponed in an attempt to obtain additional tenants for the buildings and to increase the value of the buildings. In the fall of 1979, active efforts to sell the two office buildings began, which efforts were complicated by high interest rates, by the pending bankruptcy proceeding involving Cooper River Development Co., and by the unprofitable outstanding leases with a number of the tenants of the buildings. On November 2, 1979, Jackson-Cross was given an exclusive right for a period of one year to sell the two office buildings and the 4.25 acres of land for $ 2.5 million. In March of 1980, Jackson-Cross distributed throughout the United States a marketing brochure highlighting the two office buildings offered for sale by Cooper River Development Co. and representing therein that the buildings offered an excellent opportunity for income, growth, tax shelter, and appreciation. In calculating *698 income projections set forth in the marketing brochure, the figure used for the rentable square footage of the buildings was 75,000 square feet. Numerous investors expressed interest in the buildings. In March of 1980, John G. Berg (Berg), a real estate investor and developer, began discussing a possible purchase of the buildings. Berg had been in the real estate business for 23 years. He had been in charge of the management of four to five thousand residential units and numerous office buildings in the Philadelphia area. Berg was president and chief executive officer of American Real Estate Associates, Inc. (American Associates), a corporation organized under Pennsylvania law engaged in the business of syndicating and marketing real estate limited partnerships. Berg owned 67 percent of the stock of American Associates, and Berg later acquired 100 percent of the stock of American Associates. Berg believed that the Cooper River property [2] was in an excellent location, that the buildings were well constructed, that the buildings were offered in the bankruptcy proceedings at a favorable $ 29 per square foot (versus what he believed to be the replacement cost of the buildings *699 of $ 55 to $ 85 per square foot), and that the occupancy and rental rates were lower than they would be if management of the buildings was improved. Berg believed that poor management of the buildings was reflected by a number of unfavorable provisions in the written lease agreements with tenants of the buildings, by lack of enforcement of many of the lease provisions, by inefficient billing practices, and by poor marketing. On March 24, 1980, Berg submitted an offer of $ 2,750,000 to purchase the two office buildings and the 4.25 acres of land. The offer reflected a cash downpayment of $ 230,000, and the balance to be financed with first and second mortgages. On April 29, 1980, this offer was accepted by Rogers on behalf of Cooper River Development Co., but the transaction did not close because Berg did not come up with the required cash downpayment. The *700 record does not disclose whether Berg was acting individually or on behalf of one his controlled companies in the above negotiations. During late April or early May of 1980, two of the existing tenants in the buildings made offers to purchase the property. Both offers were in the range of $ 2.3 million. On August 19, 1980, Berg, on behalf of American Associates, offered $ 2,350,000 to purchase the property. On August 28, 1980, the offer of American Associates was increased to $ 2,510,000, and this offer was accepted by the seller and approved by the Bankruptcy Court. This offer, however, also fell through because American Associates failed to come up with the required $ 250,000 cash downpayment. On October 16, 1980, Berg, on behalf of Office Buildings of Cooper River, Inc. (OBCR), another corporation he controlled, made an offer to purchase the two office buildings and the 4.25 acres of land for $ 2.5 million. This offer was accepted by the seller and apparently approved by the Bankruptcy Court. On or before December 15, 1980, OBCR made a cash downpayment totaling $ 958,848. OBCR financed the approximate $ 1.6 million balance due on the purchase price by a loan from Continental *701 Bank, Norristown, Pennsylvania (Continental Bank), secured by a mortgage on the two buildings and on the land. The loan proceeds apparently were paid into the bankruptcy proceeding on December 15, 1980. In connection with the approval of the $ 1.6 million loan, Continental Bank obtained an independent written appraisal of the buildings which concluded that the buildings and improvements thereto had a fair market value of $ 2.9 million. This appraisal indicated that it gave particular weight to the potential to increase rental income from the buildings through better management. This appraisal used 75,237 square feet as the total rentable square footage for the buildings. On December 15, 1980, simultaneously with the purchase of the two buildings and the 4.25 acres of land for $ 2.5 million, OBCR, for a stated purchase price of $ 4,770,000, agreed to sell the two buildings and all improvements to the buildings to Management of Cooper River, Inc. (MCR), a wholly owned subsidiary of American Associates and therefore a company also controlled by Berg. The 4.25 acres of land were not included in the sale by OBCR of the two buildings to MCR. The total stated purchase price for the *702 buildings and improvements was financed by a $ 4,770,000 37-year nonrecourse mortgage loan from MCR to OBCR. No cash downpayment was due on this transaction. The $ 4,770,000 mortgage loan had an initial term of 17 years, commencing as of August 1, 1980, and continuing until July 1, 1997. During this initial term, the loan was nonamortizing, and interest payments only were due at 11 percent per year, or $ 43,725 per month. For the subsequent 20 years of the mortgage loan, from July of 1997 through July of 2017, monthly payments of principal and interest were due on the mortgage loan in the amount of $ 49,235. Contrary to the schedule established for the payment of principal and interest (as set forth supra), during the first 17 years of the mortgage loan, for financial and tax accounting purposes, interest was stated to accrue on the loan under the Rule of 78's method of calculating interest. Upon agreeing to sell to MCR the two buildings and the improvements to the buildings, OBCR also entered into an agreement to lease to MCR the 4.25 acres of land on which the two buildings were located and which OBCR had purchased from Cooper River Development Co. The lease of the land *703 was for a term of 17 years, beginning as of August 1, 1980, and ending July 31, 1997. For 1980, 1981, and 1982, the rent for the land was $ 15,000 per year, for 1983 -- $ 50,000, and for 1984 and subsequent years, the annual rent for the land was 50 percent of the annual net cash flow from the two buildings after debt service. The private placement memorandum, however, indicated that the rent for the land was to be $ 50,000 per year, or each portion of a year for 1980, 1981, and 1982. Under the terms of the lease of the 4.25 acres of land, MCR also received an option to purchase the land from OBCR for an additional $ 600,000. The option was exercisable for a six-month period beginning on the first day of the last month of the 17-year lease term (i.e., the six-month option period was to begin on July 1, 1997). On December 15, 1980, Berg, on behalf of MCR, agreed to sell the buildings and improvements to the buildings to CROBA, the partnership in which petitioner invested, for a total stated purchase price of $ 5.3 million. As consideration, CROBA paid $ 530,000 in cash and assumed MCR's $ 4,770,000 nonrecourse mortgage loan that had been given to OBCR by MCR. Berg -- as the *704 controlling shareholder of American Associates, which corporation was the parent corporation of MCR, the corporate general partner of CROBA -- also represented CROBA in this transaction. MCR entered into an agreement subletting to CROBA the 4.25 acres of land on which the two buildings were located. The term of the sublease of the land is the same as the term of the lease of the land between OBCR and MCR, and lease payments due from CROBA to MCR under the sublease are identical to the lease payments due from MCR under its lease with OBCR. With the sublease of the land, CROBA and through CROBA the limited partners of CROBA, received an assignment of the option of MCR to purchase the land from OBCR for $ 600,000. Under the agreement for CROBA's purchase of the two buildings from MCR, MCR nominally agreed to refinance for CROBA the $ 4,770,000 mortgage loan at an interest rate of 8 percent if the bank prime rate of interest (or some similar index of interest rates) dropped below a certain level. In return for this commitment to refinance the mortgage loan, CROBA nominally was obligated to pay MCR an annual loan commitment fee of $ 59,625 (1.25 percent of the total principal balance *705 of the original loan). On December 15, 1980, all documents necessary to close the sale or transfer of the two office buildings and the 4.25 acres of land from the bankrupt Cooper River Development Co. to OBCR, and all documents necessary to close the transfer of the buildings and improvements from OBCR to MCR, and then from MCR to CROBA, were completed. Not all of the cash necessary to close, however, was available at the December 15, 1980, closing, and the parties agreed that the documents would be held in escrow by the title company. In December of 1980, CROBA paid the maintenance, utility, and repair expenses relating to the two buildings. The real estate settlement sheet prepared with respect to the closing of the above transactions reflects the December 15, 1980, settlement date. Expenses and taxes with respect to the buildings and the 4.25 acres of land were charged to CROBA as of December 1, 1980. During December of 1980, CROBA was responsible for the security deposits of the tenants in the two buildings. On December 15, 1980, a memorandum of insurance was issued to CROBA, showing that CROBA, as of that date, paid the insurance premium relating to an insurance policy *706 of $ 5.3 million covering the two buildings. On December 15, 1980, the parties signed and dated the settlement documents relating to the various transactions described above and placed the documents in escrow. On January 13, 1981, escrow closed. The cash downpayments were distributed. The documents were exchanged and filed of record on January 14, 1981. The private placement memorandum of CROBA projected the following income and losses of CROBA for the five months ending December 13, 1980, and for 1981 through 1987, as follows: Interest
Operating
Paid to
Deprec.
Year
Rent
Expenses
Expenses
Gen. Part.
Expense
1980
-0-
$ 430,900
$ 133,437
$ 159,600
$ 310,900
1981
$ 268,100
$ 990,500
$ 342,668
$ 163,100
$ 621,400
1982
$ 846,400
$ 929,000
$ 366,654
$ 166,800
$ 621,400
1983
$ 960,800
$ 867,700
$ 392,320
$ 70,900
$ 621,400
1984
$ 1,098,000
$ 806,200
$ 419,782
$ 109,529
$ 534,000
1985
$ 1,174,860
$ 744,800
$ 449,167
$ 135,561
$ 446,700
1986
$ 1,257,100
$ 683,400
$ 480,609
$ 163,414
$ 446,700
1987
$ 1,345.097
$ 622,000
$ 514,252
$ 193,216
$ 210,600
Organ.
Income
Year
Costs
(Loss)
1980
$ 800
($ 1,035,637)
1981
$ 2,000
($ 1,851,568)
1982
$ 2,000
($ 1,239,454)
1983
$ 2,000
($ 1,093,520)
1984
$ 2,000
($ 773,511)
1985
$ 1,200
($ 602,568)
1986
-0-
($ 517,023)
1987
-0-
($ 194,971)
*707 For years after 1987, significant net income was projected for CROBA in the private placement memorandum. In 1980, petitioner first learned of the limited partnership investment opportunity in the Cooper River office buildings. He discussed the investment in CROBA with Erwin A. Weiser (Weiser), a certified public accountant, and he was privy to inspections made of the buildings by F. Louis Wolff (Wolff), an architect and a member of the American Institute of Architects. Wolff was familiar with the economic aspects of commercial properties, including the factors of location, cost, and financing. He had invested extensively in commercial properties. Wolff also talked to tenants of the buildings. Wolff was impressed with the riverfront location of the buildings and with their overall condition. Although some repairs and upgrading would be necessary, Wolff concluded that the buildings would be a good investment. He determined that the projections of income and expenses in the offering memorandum were reasonable. Wolff communicated to Weiser the results of his investigation and his opinion about the office buildings and the investment opportunity. Weiser shared with petitioner *708 the results of Wolff's investigation. Weiser reviewed with petitioner the perceived economic benefits associated with the investment and the possible tax benefits of investing in the partnership. Weiser told petitioner that Weiser himself had invested in CROBA. Petitioner purchased one unit of the CROBA limited partnership for $ 59,300, of which $ 11,800 was paid in cash on December 9, 1980, and the balance was reflected by petitioner's three promissory notes due on March 1, 1981, 1982, and 1983, in the respective amounts of $ 21,000, $ 14,000, and $ 12,500. The three promissory notes were guaranteed by a bank letter of credit paid for by petitioner and issued in favor of CROBA. On February 28, 1981, petitioner made a $ 23,262 payment on his first promissory note, and on March 10, 1982, petitioner made a $ 16,199 payment on his second promissory note. Although petitioner apparently paid the third $ 12,500 promissory note, the record does not indicate the date of payment. The 28 limited partners in CROBA contributed to CROBA a total of $ 413,000 in cash in 1980 and a total of $ 1,662,500 in cash in 1981, 1982, and 1983, in payment of their promissory notes, reflecting a total *709 cash investment in CROBA by the limited partners of $ 2,075,500. The limited partners acquired a 99 percent interest in the income and losses of the partnership. Each individual limited partner's interest in the income and losses of the partnership was determined pro rata in accordance with his or her capital account. Petitioner's interest in the income and losses of the partnership was 2.829 percent. The schedule below sets forth the estimated rent to be received from the tenants of the buildings as projected in the private placement memorandum, as projected by Jackson-Cross, and as actually received from the tenants: Estimated Rent
from Private
Jackson-Cross
Year
Placement Memo
Projections
Actual Rent
1981
$ 643,000
$ 643,493
$ 622,000
1982
$ 846,400
$ 754,322
$ 799,733
1983
$ 960,800
$ 927,322
$ 857,900
1984
$ 1,098,000
$ 1,006,140
$ 945,016
1985
$ 1,174,800
None made
$ 939,147
1986
$ 1,257,100
None made
$ 1,177,527
1987
$ 1,345,097
None made
$ 1,424,400
The CROBA partnership was not successful. In 1984, Berg asked the limited partners to contribute more money to the partnership for additional improvements to the buildings. Additional funds *710 were not forthcoming, and the partnership was dissolved in 1986. Berg, or one of the corporations he controlled, apparently repurchased the buildings from CROBA, but the record does not indicate what CROBA realized on this sale. Norman S. Cohen, a certified public accountant, prepared CROBA's Federal partnership income tax returns for 1980, 1981, and 1982 on the accrual basis. Apparently, deductions claimed on the 1980 return are calculated on the basis of an acquisition date by CROBA of the office buildings in issue as of August 1, 1980, and in general the 1980 return claimed the amount of deductions and losses that had been set forth in the financial projections of CROBA's private placement memorandum for 1980. CROBA's 1980 partnership return reported a loss of $ 1,047,563 with respect to the two office buildings. The 1980 loss was computed as follows: 1980 Income
$ - 0 -
1980 Expenses
Interest Expense (Aug. 1 to Dec. 31)
$ 430,900
Rent for the Land
50,000
Loan Commitment Fee
59,600
General Partner Fee
50,000
Operating Expenses
133,437
Legal and Accounting
9,500
Office Supplies and Expenses
2,226
Land Option Fee
1,000
Depreciation [3]
310,900
Total Expenses
$ 1,047,563
Total Loss
$ 1,047,563
*711 CROBA's 1980 partnership return reported no rental income for 1980 due to the fact that, under the purchase agreement, until July 31, 1981, rents received from tenants of the two buildings would be retained by the general partner. CROBA's partnership return for 1981 reported a loss of $ 1,993,248 relating to the two buildings, as follows: 1981 Income
$ 259,194
1981 Expenses
Interest Expense
$ 990,528
Rent for the Land
50,000
Loan Commitment Fee
59,625
General Partner Fee
53,500
Advertising
3,253
Utilities
151,034
Water and Sewer
3,151
Exterminating and Rubbish Removal
3,334
Real Estate Taxes
84,466
Insurance
13,622
Repairs
39,366
Decorating
4,343
Elevator Maintenance
9,944
Cleaning and Grounds Maintenance
69,801
Security and Protection
10,905
Amortization of Settlement Costs
2,083
Salaries and Related Taxes
33,559
Office Supplies and Expenses
5,072
Professional Fees
5,000
Telephone
4,036
Management Fee
12,960
Data Processing
1,394
Depreciation
641,466
Total Expenses
$ 2,252,442
Total Loss
$ 1,993,248
*712 CROBA's Federal partnership income tax return for 1982 reported a total loss of $ 1,485,449 relating to the two buildings, computed as follows: 1982 Income
$ 799,733
1982 Expenses
Interest Expense
$ 929,097
Rent for the Land
50,000
Loan Commitment Fee
59,625
General Partner Fee
57,245
Advertising
17,455
Utilities
192,487
Water and Sewer
3,342
Exterminating and Rubbish Removal
4,324
Real Estate Taxes
89,810
Insurance
1,905
Repairs
32,549
Decorating
2,599
Elevator Maintenance
10,155
Cleaning and Grounds Maintenance
76,270
Security and Protection
6,093
Amortization of Settlement Costs
2,083
Salaries and Related Taxes
28,153
Office Supplies and Expenses
924
Professional Fees
2,293
Telephone
3,841
Management Fee
39,987
Data Processing
1,597
Equipment Rental
17,500
Depreciation
655,848
Total Expenses
$ 2,285,182
Total Loss
$ 1,485,449
Pursuant to extensions of time for filing their 1980 joint Federal income tax return, petitioners timely filed their 1980 tax return on or before August 15, 1981. On their joint Federal income tax returns for the years in issue, petitioners claimed the following losses relating to petitioner's investment in CROBA: *713 Year
Loss
1980
$ 29,633
1981
$ 56,389
1982
$ 42,023
On their 1980 tax return, petitioners also claimed an investment credit of $ 283 relating to petitioner's share of investment tax credits claimed by CROBA. In statutory notices of deficiency with respect to each year in issue, respondent disallowed in their entirety the losses and investment tax credits claimed by petitioners relating to petitioner's investment in CROBA. The primary basis for disallowing CROBA's claimed losses was respondent's determination that the purchase by CROBA of the two office buildings was a sham transaction lacking in economic substance. Alternatively, respondent disallowed: (1) The accrual of interest on the mortgage loan under the Rule of 78's method of accruing interest; [4] (2) depreciation claimed on the buildings in 1980 on the ground that whatever transfer occurred took place in 1981 (not 1980); (3) CROBA's use for 1980 of the half-year convention to calculate depreciation on the two buildings on the ground that that method distorted CROBA's income; and (4) the deductions claimed each year for the $ 50,000 accrued as rent on the lease of the land, the $ 59,625 accrued as a loan commitment *714 fee, and the approximate $ 50,000 accrued as a fee for the general partner, each on the ground that petitioners failed to satisfy their burden of proving the deductibility of these items. Respondent also disallowed the $ 283 investment tax credit claimed relating to petitioner's investment in CROBA. Respondent further determined additions to tax against petitioners under section 6651(a)(1) for the late filing of their 1980 Federal income tax return and under section 6661(a) for a substantial understatement of income tax on their 1982 Federal income tax return. OPINION Sham Transaction and Economic Substance
In general, business transactions are given effect *715 consistent with their substance and form. In analyzing the substance and form of business transactions, we cannot ignore the reality that tax laws affect the shape of many business transactions. Frank Lyon Co. v. United States, 435 U.S. 561, 576-580, 55 L. Ed. 2d 550, 98 S. Ct. 1291 (1978). Business transactions, therefore, are not necessarily deprived of economic substance because of the existence of significant tax benefits that accrue to investors. Frank Lyon Co. v. United States, supra at 580-581; Estate of Thomas v. Commissioner, 84 T.C. 412, 432 (1985). Where taxpayers, however, resort to "the expedient of drawing up papers to characterize transactions contrary to objective economic realities and which have no economic significance beyond expected tax benefits," the tax benefits claimed will be denied on the basis that the transactions were shams. Cooper v. Commissioner, 88 T.C. 84, 103 (1987); Falsetti v. Commissioner, 85 T.C. 332, 347 (1985). It has been stated repeatedly that to be recognized for Federal income tax purposes, transactions must have a business purpose and economic substance apart from *716 anticipated tax consequences. Knetsch v. Commissioner, 364 U.S. 361, 365-370, 5 L. Ed. 2d 128, 81 S. Ct. 132 (1960); Goldstein v. Commissioner, 364 F.2d 734, 740 (2d Cir. 1966), affg. 44 T.C. 284 (1965); Hulter v. Commissioner, 91 T.C. 371, 388 (1988). Examinations into the business purpose and economic substance of transactions are inherently factual. Levy v. Commissioner, 91 T.C. 838, 854 (1988). The business purpose inquiry tends to be an inquiry of investors' subjective purposes for entering into the transactions. Levy v. Commissioner, supra at 854; Packard v. Commissioner, 85 T.C. 397, 417 (1985). The economic substance inquiry tends to be an analysis of objective factors indicating whether the transactions have a reasonable opportunity of producing a profit, exclusive of tax benefits. Levy v. Commissioner, supra at 854; Packard v. Commissioner, supra at 417. We believe that CROBA had a legitimate business purpose for purchasing the two office buildings and that the limited partners in CROBA had a business purpose *717 for investing in the partnership. The buildings (which the Court inspected) existed. They were well constructed and well located. Tenants occupied the buildings at the time CROBA purchased the buildings. Substantial rental receipts were received during the years before us from the tenants occupying the buildings. The transactions transferring ownership of the buildings to CROBA were fully documented. Berg had substantial experience and a good reputation in the commercial real estate market, particularly in the purchase of depressed real estate, followed by the rejuvenation and remarketing of such real estate. For at least the years 1981 through 1984, actual rental income relating to the lease of the buildings matched closely the projections with respect thereto that had been made in CROBA's private placement memorandum and that had been made independently by Jackson-Cross. CROBA had a business purpose for purchasing the two office buildings, and the limited partners of CROBA had a business purpose for entering into their investments in CROBA. Whether and to what extent a transaction in dispute has economic substance is often a more difficult question, as it is in this case. *718 In determining whether and to what extent a transaction has economic substance apart from tax benefits, the presence or absence of arm's-length price negotiations and the relationship between the sales price and fair market value of the property are particularly important. See Levy v. Commissioner, supra at 856; Helba v. Commissioner, 87 T.C. 983, 1005-1007, 1014 (1986), affd. 860 F.2d 1075 (3d Cir. 1988); Zirker v. Commissioner, 87 T.C. 970, 976 (1986). Here, Berg controlled both MCR, the seller, and CROBA, the buyer. He determined the price CROBA agreed to pay MCR for the buildings and improvements to the buildings. He determined the rent and other charges to be paid by CROBA to MCR. It is clear that the sale of the office buildings to CROBA was not the result of arm's-length price negotiations. With regard to the relationship of the purchase price to the fair market value of the two buildings, the evidence is compelling that the $ 5.3 million stated purchase price for CROBA's purchase of the buildings and the improvements thereto reflected a significant overvaluation of the buildings and the *719 improvements. On the same day (namely, December 15, 1980), in an arm's-length transaction, OBCR agreed to purchase the buildings and the 4.25 acres of land for $ 2.5 million, and MCR, in a non-arm's-length transaction, agreed to purchase the same buildings for $ 4.7 million. CROBA and MCR's stated purchase price was each negotiated by Berg. Berg controlled each entity, and there is no adequate, credible explanation for the significant increases in the stated purchase price for the buildings as they were transferred through the various Berg-controlled entities and eventually to CROBA. Each party offered testimony from qualified and impressive real estate appraisers. Petitioner's appraiser testified that the fair market value, as of December 15, 1980, of the two buildings was $ 4,287,500, and that the fair market value of the 4.25 acres of land was $ 212,500, for a combined fair market value for the buildings and land of $ 4.5 million. Because of the low 11 percent interest rate being offered on the mortgage loan, petitioner's appraiser opined that the buildings would command a premium of $ 1,002,297 on top of the $ 4.5 million. Respondent's appraiser arrived at a value, as of *720 December 15, 1980, of $ 2.5 million for the two office buildings and improvements thereto. He considered the contemporaneous arm's-length sales price of $ 2.5 million (reflecting the sale from the bankrupt Cooper River Development Co. to OBCR) to be highly persuasive of the fair market value of the buildings as of December 15, 1980. The three primary points of dispute between the two appraisers are: (1) The weight to be given the contemporaneous sale between Cooper River Development Co. and OBCR; (2) whether the rentable square feet in the two buildings included the commonly used areas, such as hallways and lobbies; and (3) whether a 10-percent or 13.5-percent capitalization rate should be applied to the estimated rental income from the buildings. We believe that very significant weight should be given to the simultaneous transaction between arm's-length parties involving the precise buildings that are the subject matter of the present case (namely, the sale from the bankrupt Cooper River Development Co. to OBCR). Berg, on behalf of OBCR, among other things, certainly took into account the condition of the buildings, the location of the property, the potential rental income, and *721 the bankruptcy proceeding, in calculating how much OBCR would offer for the buildings and the land. Representatives of the Cooper River Development Co. presumably did likewise in calculating the selling price for the buildings and the land, and those considerations produced an arm's-length selling price of $ 2.5 million on December 15, 1980. We believe the significant "same-day" increases in the selling price of the two buildings to MCR ($ 4.5 million) and to CROBA ($ 5.3 million) were largely unjustified and were not supported by the fair market value of the buildings. Certainly, no independent party participated in the negotiations (assuming there were any negotiations) that resulted in those price increases. Certainly, those increases are highly suspect, and petitioners bear a heavy burden of proof to establish that those increases were justified. We also note that in December of 1980, the independent appraiser obtained for Continental Bank appraised the property at $ 2.9 million, which appraisal took into account the potential to increase the value of the buildings with better management. The dispute concerning the rentable square feet in the two buildings is important to *722 the income projections of the appraisers. Petitioner's appraiser used a figure of 95,000 rentable square feet by including in his calculation the common areas in the two buildings such as hallways and lobbies. Respondent's appraiser used 75,000 square feet for the rentable square feet based upon the square footage in the two buildings that would be available for the tenants' exclusive use. Respondent's appraiser acknowledges that including common space in the calculation of rentable square feet was becoming acceptable in the early 1980s, but he did not do so here. We agree. We note that the 1980 Jackson-Cross promotional material, in its income calculations for the buildings, used 75,237 square feet as the rentable square footage for the two buildings, as did the independent appraisal of the two buildings obtained for Continental Bank. We believe that these contemporaneous evaluations of the property by a real estate firm representing the seller of the property (and therefore interested in placing a high value on the property) and by an independent appraiser obtained for a commercial bank are the best indications of how a buyer and a seller in 1980, in this particular market, *723 would determine the rentable square footage of these two buildings. With regard to the capitalization rate to apply to the projected rental income from the two buildings, petitioner's appraiser used a capitalization rate of 10 percent. Respondent's appraiser used a capitalization rate of 13.5 percent. Each appraiser argues forcefully that his capitalization rate is the most appropriate. Because we conclude that the fair market value of the buildings is governed primarily by the sale for $ 2.5 million that occurred between Cooper River Development Co. and OBCR, we need not, in this case, resolve the question of which capitalization rate is the most appropriate. We believe that the two buildings purchased by CROBA had a value, on December 15, 1980, of $ 2.9 million. This is consistent with the independent appraisal obtained for Continental Bank. It takes into account, as did the Continental Bank appraisal, the potential for increasing the income from the buildings, and thereby increasing the value of the buildings, through better management. It thus takes into account what Berg, as an experienced manager of commercial real estate, arguably brought to the buildings and to the *724 ownership of the buildings at the time the buildings were purchased by CROBA. We also believe that this $ 2.9 million valuation for the two buildings adequately reflects the fact that the financing for CROBA's purchase of the buildings was spread over 37 years with favorable payment terms and a favorable interest rate. Further, it reflects the obligation of the general partner of CROBA to advance cash to CROBA for improvements and for cash shortfalls, and it reflects the fact that the partners in CROBA invested approximately $ 2 million in cash in the transaction. For the reasons stated, CROBA's investment in the two office buildings will be regarded as having economic substance but only to the extent of the fair market value of the buildings as of December 15, 1980 (namely, to the extent of $ 2.9 million). The portion of the stated purchase price in excess of $ 2.9 million will be treated as a mere contingent liability. Brannen v. Commissioner, 722 F.2d 695, 701 (11th Cir. 1984), affg. 78 T.C. 471 (1982); Cooper v. Commissioner, 88 T.C. 84, 111 (1987); Waddell v. Commissioner, 86 T.C. 848, 901-903 (1986), *725 affd. per curiam on other issues 841 F.2d 264 (9th Cir. 1988). Accordingly, after the cash downpayment paid by CROBA in the amount of $ 530,000 is recognized, the mortgage note indebtedness of CROBA to MCR is treated as having economic substance only to the extent of $ 2,370,000 ($ 2.9 million less $ 530,000). Interest deductions are allowed to CROBA only to the extent they relate to the portion of the mortgage note indebtedness that is recognized herein and only on the basis of the economic accrual of interest. Transfer of Ownership
In order to constitute a sale or a transfer of ownership of property for Federal income tax purposes, the benefits and burdens of ownership must pass from the seller to the buyer. Whether a sale has occurred is a question of fact that must be ascertained from the intentions of the parties as evidenced by the written agreements and by all of the relevant facts and circumstances. Hulter v. Commissioner, 91 T.C. 371, 388 (1988); Durkin v. Commissioner, 87 T.C. 1329, 1367 (1986), affd. 872 F.2d 1271 (7th Cir. 1989). In Grodt & McKay Realty, Inc. v. Commissioner, 77 T.C. 1221, 1237 (1981), *726 we identified some of the factors that are considered in determining whether a transaction is to be recognized as a sale or as a transfer of ownership of property, as follows: The term "sale" is given its ordinary meaning for Federal income tax purposes and is generally defined as a transfer of property for money or a promise to pay money. The key to deciding whether petitioners' transactions * * * are sales is to determine whether the benefits and burdens of ownership have passed * * *. * * * Some of the factors which have been considered by courts in making this determination are: (1) Whether legal title passes; (2) how the parties treat the transaction; (3) whether an equity was acquired in the property; (4) whether the contract creates a present obligation on the seller to execute and deliver a deed and a present obligation on the purchaser to make payments; (5) whether the right of possession is vested in the purchaser; (6) which party pays the property taxes; (7) which party bears the risk of loss or damage to the property; and (8) which party receives the profits from the operation and sale of the property. * * * [Citations omitted.]
In the instant case, documentation *727 transferring the buildings from Cooper River Development Co. to OBCR, from OBCR to MCR, and from MCR to CROBA is complete. The parties treated the transaction as a sale. CROBA was vested with rights of possession to the buildings. It bore the risk of loss and paid the insurance premiums relating to the buildings. CROBA received the rental income generated by the property, after certain initial rental income was paid to the general partner. Because of the interest-only payments due, during the initial term of the purchase money loan, CROBA would not build up equity in the buildings. Nevertheless, CROBA did have a right to continued ownership of the buildings and the right to realize appreciation, if any, in the value of the buildings through any subsequent sale of the buildings. We conclude that CROBA acquired ownership of the buildings. Respondent also contends that CROBA should not be allowed depreciation deductions and investment tax credits for 1980 because the partnership arguably did not acquire its ownership interest in the buildings until escrow closed on January 13, 1981. The evidence, however, indicates that the transfer of the buildings to CROBA took place on December *728 15, 1980. All of the parties met on that date, and the settlement documents were completed on and as of that date. All expenses relating to the buildings were allocated to CROBA as of December 1, 1980. As of December 15, 1980, CROBA assumed responsibility for insurance on the buildings. We conclude that ownership of the two buildings was transferred to CROBA on December 15, 1980. Component Depreciation Using Half-Year Convention
Respondent challenges CROBA's method of calculating its depreciation deduction with respect to the two buildings. Respondent argues that CROBA, on the facts of this case, in calculating its depreciation deduction should not be allowed to use the component method in any year, nor the half-year convention for 1980. Petitioner argues that CROBA properly used the component method and that respondent's objection to CROBA's use of the half-year convention was not raised until the post-trial briefs were filed in his case, and that we, therefore, should not consider this issue. We agree with respondent on both points. The component method of calculating depreciation on buildings may be used if the cost of the buildings is properly allocated to the *729 various components based on their value, and if useful lives are assigned to the components based on the condition of the components at the time of acquisition. See Lesser v. Commissioner, 42 T.C. 688, 703-705 (1964), affd. 352 F.2d 789 (5th Cir. 1966); see Rev. Rul. 73-410, 1973-2 C.B. 53. Absent such a demonstration, however, the composite method of calculating depreciation deductions must be used. In this case, the only evidence relating to the allocations that were made to support the component method of depreciation was the testimony of Berg and of the tax return preparer. Although Berg is an experienced real estate promoter and manager, we believe his testimony in this regard in biased and unpersuasive. Berg also testified that an independent appraiser arrived at allocations within 3 percent of his allocations. The allocations of that appraiser, however, were not offered into evidence, and Berg's testimony does not suffice to show that the component method of depreciation was properly utilized with respect to the two office buildings. See Lesser v. Commissioner, supra at 705. We hold *730 that petitioners are entitled to depreciation deductions with respect to the two buildings calculated only upon a composite method of depreciation. As indicated, because respondent's challenge to CROBA's use of the half-year convention to calculate depreciation for 1980 was first raised in respondent's post-trial briefs, petitioners argue that this issue was untimely raised and that we should not consider it. Generally, whether respondent can raise a theory not specified in the pleadings is governed by whether the taxpayers would be prejudiced. "The basic consideration is whether the taxpayer is surprised and disadvantaged when the Commissioner has failed to plead [the theory in a timely fashion] * * *." Stewart v. Commissioner, 714 F.2d 977, 986 (9th Cir. 1983), affg. a Memorandum Opinion of this Court, citing Commissioner v. Transport Mfg. & Equip. Co., 478 F.2d 731, 736 (8th Cir. 1973). See Rubin v. Commissioner, 56 T.C. 1155, 1163 (1971), affd. 460 F.2d 1216 (2d Cir. 1972). On the facts of this case, in our discretion, we allow respondent to challenge CROBA's use of the half-year convention to calculate *731 depreciation for 1980 relating to the two buildings. Facts relevant to this issue are not in dispute. The issue, in this case, raises essentially a legal question or an ultimate fact question with respect to which the underlying facts are not in dispute. We do not believe that addressing this issue, in this particular case, prejudices petitioners herein in terms of evidence or in their ability to argue the issue. Use of the half-year convention is governed by section 1.167(a)-10(b), Income Tax Regs., which provides, in part, as follows: An averaging convention, if used, must be consistently followed as to the account or accounts for which it is adopted, and must be applied to both additions and retirements. In any year in which an averaging convention substantially distorts the depreciation allowance for the taxable year, it may not be used.
Here, CROBA's use of the half-year convention has the effect of treating CROBA as if it owned the two buildings for the entire last six months of 1980. It is obvious that, on the facts of this case, use of the half-year convention would substantially distort CROBA's depreciation allowance for 1980. See Fuentes v. Commissioner, 85 T.C. 657, 662 (1985). *732 Use of the half-year convention to calculate CROBA's depreciation allowance for 1980 with respect to the two buildings is disallowed. Deductibility of Rent, Loan Commitment Fees, General Partner's Fees, and Investment Tax Credit
Petitioners summarily argue that $ 42,500 of the $ 50,000 claimed each year represents a reasonable annual rental payment for lease of the 4.25 acres of land on which the two buildings were located. Other than making the sham transaction argument that we have previously addressed, respondent summarily argues that CROBA's annual payment for lease of the land should be disallowed. As noted, the lease document between MCR and CROBA reflected an obligation of CROBA to pay rent for the 4.25 acres of land of $ 15,000 per year. That is the controlling document, not the private placement memorandum which indicated that the rent was $ 50,000 per year. We allow CROBA a rental deduction of $ 15,000 for 1980 (pro rated from December 15, 1980, through December 31, 1980), for 1981, and for 1982. With regard to the deductibility of the $ 59,625 nominally to be paid each year by CROBA to MCR for MCR's commitment to refinance the $ 4,770,000 mortgage loan, the *733 deductibility of the $ 50,000 nominally to be paid each year to the general partner as a fee, and the $ 283 investment tax credit, both parties again make only summary arguments. Petitioners have failed to satisfy their burden of proof on these issues, and petitioners therefore are not entitled to these claimed deductions. Rule 142(a). Additions to Tax
Respondent determined an addition to tax under section 6651(a)(1) for petitioners' alleged failure to timely file their 1980 Federal income tax return, and an addition to tax under section 6661(a) relating to petitioners' 1982 Federal income tax return. Section 6651(a)(1) provides a 5-percent per month addition to the amount of tax owed, not to exceed 25 percent, for failure to timely file a tax return, unless it is shown that the failure is "due to reasonable cause and not * * * willful neglect." Section 7502 provides that timely mailing of a return constitutes timely filing. Pursuant to extensions of time to file their 1980 Federal income tax return until August 15, 1981, petitioners timely filed their 1980 tax return on or before August 15, 1981. Accordingly, the return was timely, and the imposition of this addition *734 to tax is not sustained. Section 6661(a) imposes an addition to tax equal to 10 percent of the underpayment of tax attributable to a substantial understatement of income tax on a tax return filed after December 31, 1982. This addition to tax was increased to 25 percent for additions to tax assessed after October 21, 1986, by the Omnibus Budget Reconciliation Act of 1986, Pub. L. 99-509, 100 Stat. 1951. See Pallottini v. Commissioner, 90 T.C. 498 (1988). A substantial understatement of income tax is any understatement exceeding the greater of 10 percent of the tax required to be shown on the return for the year or $ 5,000. Sec. 6661(b)(1)(A). The amount of the tax understatement shall be reduced, however, by portions of the understatement attributable to the tax treatment of items for which there is or was substantial authority, and items with respect to which the taxpayer adequately disclosed the relevant facts in the tax return. Here, the major items disallowed consist of depreciation and interest expenses. Petitioners have demonstrated no set of circumstances showing that there was substantial authority for their treatment of these items. Petitioners *735 urge that the Rule of 78's computation of interest was supported by prior case law and by respondent's own rulings. We disagree. In Prabel v. Commissioner, 91 T.C. 1101, 1128 (1988), affd. 882 F.2d 820 (3d Cir. 1989), we determined that "no legal authority existed" upon which the partnership could have relied in support of the accrual of interest under the Rule of 78's on the long-term mortgage indebtedness. The same is true here. Further, CROBA's partnership and petitioners' individual Federal income tax returns fail to reveal any facts disclosing that the depreciation at issue was computed under the component depreciation method, or a disclosure that the interest was computed under the Rule of 78's. Accordingly, there is no basis for reducing the understatements of income tax for purposes of section 6661(b). For the reasons set forth above, Decisions will be entered under Rule 155. Footnotes
1. Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954 as in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.↩
2. "Property" in this opinion refers generally to the two office buildings and the 4.25 acres of land that were offered for sale by Cooper River Development Co.↩
3. Depreciation was determined by using a cost basis of $ 5.3 million for the two office buildings. Depreciation was computed on the component parts under the straight-line method, with various useful lives, with an average useful life of 8-1/2 years, and a half-year convention.↩
4. In our opinion in Levy v. Commissioner, 92 T.C. 1360↩ (1989), we held that the use by CROBA, for Federal income tax purposes, of the Rule of 78's method for calculating the accrual of interest associated with its assumption of the $ 4,770,000 mortgage loan did not result in a clear reflection of CROBA's income and was not allowable.